HAMDI ET AL. *v.* RUMSFELD, SECRETARY OF
DEFENSE, ET AL.

No. 03–6696.  Argued April 28, 2004—Decided June 28, 2004

508

*Frank W. Dunham, Jr.,* argued the cause for petitioners. With him on the briefs were *Geremy C. Kamens, Kenneth P. Troccoli,* and *Frances H. Pratt.*

*Deputy Solicitor General Clement* argued the cause for respondents. With him on the brief were *Solicitor General Olson, Gregory G. Garre,* and *John A. Drennan.**

*Briefs of *amici curiae* urging reversal were filed for the American Bar Association by *Dennis W. Archer* and *Barry Sullivan;* for AmeriCares et al. by *Steven M. Pesner, Michael Small,* and *Jeffrey P. Kehne;* for the American Civil Liberties Union et al. by *Steven R. Shapiro, Sharon M. McGowan, David Saperstein, Jeffrey Sinensky, Kara Stein,* and *Arthur Bryant;* for the Cato Institute by *Timothy Lynch;* for Global Rights by *James F. Fitzpatrick, Kathleen A. Behan,* and *Gay J. McDougall;* for Wil-

JUSTICE O'CONNOR announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE KENNEDY, and JUSTICE BREYER join.

At this difficult time in our Nation's history, we are called upon to consider the legality of the Government's detention of a United States citizen on United States soil as an "enemy combatant" and to address the process that is constitutionally owed to one who seeks to challenge his classification as such. The United States Court of Appeals for the Fourth Circuit held that petitioner Yaser Hamdi's detention was legally authorized and that he was entitled to no further opportunity to challenge his enemy-combatant label. We now vacate and remand. We hold that although Congress authorized the detention of combatants in the narrow circumstances alleged here, due process demands that a citizen held in the United States as an enemy combatant be given a meaningful opportunity to contest the factual basis for that detention before a neutral decisionmaker.

---

liam J. Aceves et al. by *Douglas W. Baruch;* for Charles B. Gittings, Jr., by *Donald G. Rehkopf, Jr.;* for the Honorable Nathaniel R. Jones et al. by *Robert P. LoBue;* for Douglas Peterson et al. by *Philip Allen Lacovara* and *Andrew J. Pincus;* and for Mary Robinson et al. by *Harold Hongju Koh* and *Jonathan M. Freiman.*

Briefs of *amici curiae* urging affirmance were filed for the American Center for Law & Justice by *Jay Alan Sekulow, Thomas P. Monaghan, Stuart J. Roth, Colby M. May, James M. Henderson, Sr., Joel H. Thornton, John P. Tuskey,* and *Shannon D. Woodruff;* for the Center for American Unity et al. by *Barnaby W. Zall;* for the Claremont Institute Center for Constitutional Jurisprudence by *John C. Eastman* and *Edwin Meese III;* for Citizens for the Common Defence by *Adam H. Charnes;* and for the Washington Legal Foundation et al. by *Thomas V. Loran, William T. DeVinney, Daniel J. Popeo,* and *Richard A. Samp.*

A brief of *amici curiae* urging affirmance in No. 03–6696 and reversal in No. 03–1027, *Rumsfeld, Secretary of Defense* v. *Padilla et al., ante,* p. 426, was filed for Senator John Cornyn et al. by *Senator Cornyn,* pro se.

*Karen B. Tripp* filed a brief for the Eagle Forum Education & Legal Defense Fund as *amicus curiae.*

I

On September 11, 2001, the al Qaeda terrorist network used hijacked commercial airliners to attack prominent targets in the United States. Approximately 3,000 people were killed in those attacks. One week later, in response to these "acts of treacherous violence," Congress passed a resolution authorizing the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" or "harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." Authorization for Use of Military Force (AUMF), 115 Stat. 224. Soon thereafter, the President ordered United States Armed Forces to Afghanistan, with a mission to subdue al Qaeda and quell the Taliban regime that was known to support it.

This case arises out of the detention of a man whom the Government alleges took up arms with the Taliban during this conflict. His name is Yaser Esam Hamdi. Born in Louisiana in 1980, Hamdi moved with his family to Saudi Arabia as a child. By 2001, the parties agree, he resided in Afghanistan. At some point that year, he was seized by members of the Northern Alliance, a coalition of military groups opposed to the Taliban government, and eventually was turned over to the United States military. The Government asserts that it initially detained and interrogated Hamdi in Afghanistan before transferring him to the United States Naval Base in Guantanamo Bay in January 2002. In April 2002, upon learning that Hamdi is an American citizen, authorities transferred him to a naval brig in Norfolk, Virginia, where he remained until a recent transfer to a brig in Charleston, South Carolina. The Government contends that Hamdi is an "enemy combatant," and that this status justifies holding him in the United States indefinitely—without formal charges or proceedings—unless and until it makes the

determination that access to counsel or further process is warranted.

In June 2002, Hamdi's father, Esam Fouad Hamdi, filed the present petition for a writ of habeas corpus under 28 U. S. C. § 2241 in the Eastern District of Virginia, naming as petitioners his son and himself as next friend. The elder Hamdi alleges in the petition that he has had no contact with his son since the Government took custody of him in 2001, and that the Government has held his son "without access to legal counsel or notice of any charges pending against him." App. 103, 104. The petition contends that Hamdi's detention was not legally authorized. *Id.*, at 105. It argues that, "[a]s an American citizen, . . . Hamdi enjoys the full protections of the Constitution," and that Hamdi's detention in the United States without charges, access to an impartial tribunal, or assistance of counsel "violated and continue[s] to violate the Fifth and Fourteenth Amendments to the United States Constitution." *Id.*, at 107. The habeas petition asks that the court, among other things, (1) appoint counsel for Hamdi; (2) order respondents to cease interrogating him; (3) declare that he is being held in violation of the Fifth and Fourteenth Amendments; (4) "[t]o the extent Respondents contest any material factual allegations in this Petition, schedule an evidentiary hearing, at which Petitioners may adduce proof in support of their allegations"; and (5) order that Hamdi be released from his "unlawful custody." *Id.*, at 108–109. Although his habeas petition provides no details with regard to the factual circumstances surrounding his son's capture and detention, Hamdi's father has asserted in documents found elsewhere in the record that his son went to Afghanistan to do "relief work," and that he had been in that country less than two months before September 11, 2001, and could not have received military training. *Id.*, at 188–189. The 20-year-old was traveling on his own for the first time, his father says, and "[b]ecause of his lack of experience, he was

trapped in Afghanistan once the military campaign began." *Ibid.*

The District Court found that Hamdi's father was a proper next friend, appointed the federal public defender as counsel for the petitioners, and ordered that counsel be given access to Hamdi. *Id.,* at 113–116. The United States Court of Appeals for the Fourth Circuit reversed that order, holding that the District Court had failed to extend appropriate deference to the Government's security and intelligence interests. 296 F. 3d 278, 279, 283 (2002). It directed the District Court to consider "the most cautious procedures first," *id.,* at 284, and to conduct a deferential inquiry into Hamdi's status, *id.,* at 283. It opined that "if Hamdi is indeed an 'enemy combatant' who was captured during hostilities in Afghanistan, the government's present detention of him is a lawful one." *Ibid.*

On remand, the Government filed a response and a motion to dismiss the petition. It attached to its response a declaration from one Michael Mobbs (hereinafter Mobbs Declaration), who identified himself as Special Advisor to the Under Secretary of Defense for Policy. Mobbs indicated that in this position, he has been "substantially involved with matters related to the detention of enemy combatants in the current war against the al Qaeda terrorists and those who support and harbor them (including the Taliban)." App. 148. He expressed his "familiar[ity]" with Department of Defense and United States military policies and procedures applicable to the detention, control, and transfer of al Qaeda and Taliban personnel, and declared that "[b]ased upon my review of relevant records and reports, I am also familiar with the facts and circumstances related to the capture of . . . Hamdi and his detention by U. S. military forces." * *Ibid.*

Mobbs then set forth what remains the sole evidentiary support that the Government has provided to the courts for Hamdi's detention. The declaration states that Hamdi "traveled to Afghanistan" in July or August 2001, and that

he thereafter "affiliated with a Taliban military unit and received weapons training." *Ibid.* It asserts that Hamdi "remained with his Taliban unit following the attacks of September 11" and that, during the time when Northern Alliance forces were "engaged in battle with the Taliban," "Hamdi's Taliban unit surrendered" to those forces, after which he "surrender[ed] his Kalishnikov assault rifle" to them. *Id.*, at 148–149. The Mobbs Declaration also states that, because al Qaeda and the Taliban "were and are hostile forces engaged in armed conflict with the armed forces of the United States," "individuals associated with" those groups "were and continue to be enemy combatants." *Id.*, at 149. Mobbs states that Hamdi was labeled an enemy combatant "[b]ased upon his interviews and in light of his association with the Taliban." *Ibid.* According to the declaration, a series of "U. S. military screening team[s]" determined that Hamdi met "the criteria for enemy combatants," and "[a] subsequent interview of Hamdi has confirmed the fact that he surrendered and gave his firearm to Northern Alliance forces, which supports his classification as an enemy combatant." *Id.*, at 149–150.

After the Government submitted this declaration, the Fourth Circuit directed the District Court to proceed in accordance with its earlier ruling and, specifically, to "'consider the sufficiency of the Mobbs declaration as an independent matter before proceeding further.'" 316 F. 3d 450, 462 (2003). The District Court found that the Mobbs Declaration fell "far short" of supporting Hamdi's detention. App. 292. It criticized the generic and hearsay nature of the affidavit, calling it "little more than the government's 'say-so.'" *Id.*, at 298. It ordered the Government to turn over numerous materials for *in camera* review, including copies of all of Hamdi's statements and the notes taken from interviews with him that related to his reasons for going to Afghanistan and his activities therein; a list of all interrogators who had questioned Hamdi and their names and addresses;

statements by members of the Northern Alliance regarding Hamdi's surrender and capture; a list of the dates and locations of his capture and subsequent detentions; and the names and titles of the United States Government officials who made the determinations that Hamdi was an enemy combatant and that he should be moved to a naval brig. *Id.,* at 185–186. The court indicated that all of these materials were necessary for "meaningful judicial review" of whether Hamdi's detention was legally authorized and whether Hamdi had received sufficient process to satisfy the Due Process Clause of the Constitution and relevant treaties or military regulations. *Id.,* at 291–292.

The Government sought to appeal the production order, and the District Court certified the question of whether the Mobbs Declaration, " 'standing alone, is sufficient as a matter of law to allow a meaningful judicial review of [Hamdi's] classification as an enemy combatant.' " 316 F. 3d, at 462. The Fourth Circuit reversed, but did not squarely answer the certified question. It instead stressed that, because it was "undisputed that Hamdi was captured in a zone of active combat in a foreign theater of conflict," no factual inquiry or evidentiary hearing allowing Hamdi to be heard or to rebut the Government's assertions was necessary or proper. *Id.,* at 459. Concluding that the factual averments in the Mobbs Declaration, "if accurate," provided a sufficient basis upon which to conclude that the President had constitutionally detained Hamdi pursuant to the President's war powers, it ordered the habeas petition dismissed. *Id.,* at 473. The Fourth Circuit emphasized that the "vital purposes" of the detention of uncharged enemy combatants—preventing those combatants from rejoining the enemy while relieving the military of the burden of litigating the circumstances of wartime captures halfway around the globe—were interests "directly derived from the war powers of Articles I and II." *Id.,* at 465–466. In that court's view, because "Article III contains nothing analogous to the specific powers of war so

carefully enumerated in Articles I and II," *id.*, at 463, separation of powers principles prohibited a federal court from "delv[ing] further into Hamdi's status and capture," *id.*, at 473. Accordingly, the District Court's more vigorous inquiry "went far beyond the acceptable scope of review." *Ibid.*

On the more global question of whether legal authorization exists for the detention of citizen enemy combatants at all, the Fourth Circuit rejected Hamdi's arguments that 18 U. S. C. § 4001(a) and Article 5 of the Geneva Convention rendered any such detentions unlawful. The court expressed doubt as to Hamdi's argument that § 4001(a), which provides that "[n]o citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress," required express congressional authorization of detentions of this sort. But it held that, in any event, such authorization was found in the post-September 11 AUMF. 316 F. 3d, at 467. Because "capturing and detaining enemy combatants is an inherent part of warfare," the court held, "the 'necessary and appropriate force' referenced in the congressional resolution necessarily includes the capture and detention of any and all hostile forces arrayed against our troops." *Ibid.*; see also *id.*, at 467–468 (noting that Congress, in 10 U. S. C. § 956(5), had specifically authorized the expenditure of funds for keeping prisoners of war and persons whose status was determined "to be similar to prisoners of war," and concluding that this appropriation measure also demonstrated that Congress had "authoriz[ed these individuals'] detention in the first instance"). The court likewise rejected Hamdi's Geneva Convention claim, concluding that the convention is not self-executing and that, even if it were, it would not preclude the Executive from detaining Hamdi until the cessation of hostilities. 316 F. 3d, at 468–469.

Finally, the Fourth Circuit rejected Hamdi's contention that its legal analyses with regard to the authorization for the detention scheme and the process to which he was consti-

tutionally entitled should be altered by the fact that he is an American citizen detained on American soil. Relying on *Ex parte Quirin*, 317 U. S. 1 (1942), the court emphasized that "[o]ne who takes up arms against the United States in a foreign theater of war, regardless of his citizenship, may properly be designated an enemy combatant and treated as such." 316 F. 3d, at 475. "The privilege of citizenship," the court held, "entitles Hamdi to a limited judicial inquiry into his detention, but only to determine its legality under the war powers of the political branches. At least where it is undisputed that he was present in a zone of active combat operations, we are satisfied that the Constitution does not entitle him to a searching review of the factual determinations underlying his seizure there." *Ibid.*

The Fourth Circuit denied rehearing en banc, 337 F. 3d 335 (2003), and we granted certiorari, 540 U. S. 1099 (2004). We now vacate the judgment below and remand.

## II

The threshold question before us is whether the Executive has the authority to detain citizens who qualify as "enemy combatants." There is some debate as to the proper scope of this term, and the Government has never provided any court with the full criteria that it uses in classifying individuals as such. It has made clear, however, that, for purposes of this case, the "enemy combatant" that it is seeking to detain is an individual who, it alleges, was "'part of or supporting forces hostile to the United States or coalition partners'" in Afghanistan and who "'engaged in an armed conflict against the United States'" there. Brief for Respondents 3. We therefore answer only the narrow question before us: whether the detention of citizens falling within that definition is authorized.

The Government maintains that no explicit congressional authorization is required, because the Executive possesses plenary authority to detain pursuant to Article II of the Con-

stitution. We do not reach the question whether Article II provides such authority, however, because we agree with the Government's alternative position, that Congress has in fact authorized Hamdi's detention, through the AUMF.

Our analysis on that point, set forth below, substantially overlaps with our analysis of Hamdi's principal argument for the illegality of his detention. He posits that his detention is forbidden by 18 U. S. C. §4001(a). Section 4001(a) states that "[n]o citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." Congress passed §4001(a) in 1971 as part of a bill to repeal the Emergency Detention Act of 1950, 50 U. S. C. §811 *et seq.*, which provided procedures for executive detention, during times of emergency, of individuals deemed likely to engage in espionage or sabotage. Congress was particularly concerned about the possibility that the Act could be used to reprise the Japanese-American internment camps of World War II. H. R. Rep. No. 92–116 (1971); *id.*, at 4 ("The concentration camp implications of the legislation render it abhorrent"). The Government again presses two alternative positions. First, it argues that §4001(a), in light of its legislative history and its location in Title 18, applies only to "the control of civilian prisons and related detentions," not to military detentions. Brief for Respondents 21. Second, it maintains that §4001(a) is satisfied, because Hamdi is being detained "pursuant to an Act of Congress"—the AUMF. *Id.*, at 21–22. Again, because we conclude that the Government's second assertion is correct, we do not address the first. In other words, for the reasons that follow, we conclude that the AUMF is explicit congressional authorization for the detention of individuals in the narrow category we describe (assuming, without deciding, that such authorization is required), and that the AUMF satisfied §4001(a)'s requirement that a detention be "pursuant to an Act of Congress" (assuming, without deciding, that §4001(a) applies to military detentions).

The AUMF authorizes the President to use "all necessary and appropriate force" against "nations, organizations, or persons" associated with the September 11, 2001, terrorist attacks. 115 Stat. 224. There can be no doubt that individuals who fought against the United States in Afghanistan as part of the Taliban, an organization known to have supported the al Qaeda terrorist network responsible for those attacks, are individuals Congress sought to target in passing the AUMF. We conclude that detention of individuals falling into the limited category we are considering, for the duration of the particular conflict in which they were captured, is so fundamental and accepted an incident to war as to be an exercise of the "necessary and appropriate force" Congress has authorized the President to use.

The capture and detention of lawful combatants and the capture, detention, and trial of unlawful combatants, by "universal agreement and practice," are "important incident[s] of war." *Ex parte Quirin, supra,* at 28, 30. The purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again. Naqvi, Doubtful Prisoner-of-War Status, 84 Int'l Rev. Red Cross 571, 572 (2002) ("[C]aptivity in war is 'neither revenge, nor punishment, but solely protective custody, the only purpose of which is to prevent the prisoners of war from further participation in the war'" (quoting decision of Nuremberg Military Tribunal, reprinted in 41 Am. J. Int'l L. 172, 229 (1947))); W. Winthrop, Military Law and Precedents 788 (rev. 2d ed. 1920) ("The time has long passed when 'no quarter' was the rule on the battlefield . . . . It is now recognized that 'Captivity is neither a punishment nor an act of vengeance,' but 'merely a temporary detention which is devoid of all penal character.' . . . 'A prisoner of war is no convict; his imprisonment is a simple war measure'" (citations omitted)); cf. *In re Territo,* 156 F. 2d 142, 145 (CA9 1946) ("The object of capture is to prevent the captured individual from serving the enemy. He is disarmed and from then on

must be removed as completely as practicable from the front, treated humanely and in time exchanged, repatriated or otherwise released" (footnotes omitted)).

There is no bar to this Nation's holding one of its own citizens as an enemy combatant. In *Quirin*, one of the detainees, Haupt, alleged that he was a naturalized United States citizen. 317 U. S., at 20. We held that "[c]itizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts, are enemy belligerents within the meaning of . . . the law of war." *Id.*, at 37–38. While Haupt was tried for violations of the law of war, nothing in *Quirin* suggests that his citizenship would have precluded his mere detention for the duration of the relevant hostilities. See *id.*, at 30–31. See also Lieber Code ¶ 153, Instructions for the Government of Armies of the United States in the Field, Gen. Order No. 100 (1863), reprinted in 2 F. Lieber, Miscellaneous Writings, p. 273, ¶ 153 (1880) (contemplating, in code binding the Union Army during the Civil War, that "captured rebels" would be treated "as prisoners of war"). Nor can we see any reason for drawing such a line here. A citizen, no less than an alien, can be "part of or supporting forces hostile to the United States or coalition partners" and "engaged in an armed conflict against the United States," Brief for Respondents 3; such a citizen, if released, would pose the same threat of returning to the front during the ongoing conflict.

In light of these principles, it is of no moment that the AUMF does not use specific language of detention. Because detention to prevent a combatant's return to the battlefield is a fundamental incident of waging war, in permitting the use of "necessary and appropriate force," Congress has clearly and unmistakably authorized detention in the narrow circumstances considered here.

Hamdi objects, nevertheless, that Congress has not authorized the *indefinite* detention to which he is now subject.

The Government responds that "the detention of enemy combatants during World War II was just as 'indefinite' while that war was being fought." *Id.*, at 16. We take Hamdi's objection to be not to the lack of certainty regarding the date on which the conflict will end, but to the substantial prospect of perpetual detention. We recognize that the national security underpinnings of the "war on terror," although crucially important, are broad and malleable. As the Government concedes, "given its unconventional nature, the current conflict is unlikely to end with a formal cease-fire agreement." *Ibid.* The prospect Hamdi raises is therefore not farfetched. If the Government does not consider this unconventional war won for two generations, and if it maintains during that time that Hamdi might, if released, rejoin forces fighting against the United States, then the position it has taken throughout the litigation of this case suggests that Hamdi's detention could last for the rest of his life.

It is a clearly established principle of the law of war that detention may last no longer than active hostilities. See Article 118 of the Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, [1955] 6 U. S. T. 3316, 3406, T. I. A. S. No. 3364 ("Prisoners of war shall be released and repatriated without delay after the cessation of active hostilities"). See also Article 20 of the Hague Convention (II) on Laws and Customs of War on Land, July 29, 1899, 32 Stat. 1817 (as soon as possible after "conclusion of peace"); Hague Convention (IV), *supra*, Oct. 18, 1907, 36 Stat. 2301 ("conclusion of peace" (Art. 20)); Geneva Convention, *supra*, July 27, 1929, 47 Stat. 2055 (repatriation should be accomplished with the least possible delay after conclusion of peace (Art. 75)); Paust, Judicial Power to Determine the Status and Rights of Persons Detained without Trial, 44 Harv. Int'l L. J. 503, 510–511 (2003) (prisoners of war "can be detained during an armed conflict, but the detaining country must release and repatriate them 'without delay after the cessation of active hostilities,' unless they are

being lawfully prosecuted or have been lawfully convicted of crimes and are serving sentences" (citing Arts. 118, 85, 99, 119, 129, Geneva Convention (III), 6 U. S. T., at 3384, 3392, 3406, 3418)).

Hamdi contends that the AUMF does not authorize indefinite or perpetual detention. Certainly, we agree that indefinite detention for the purpose of interrogation is not authorized. Further, we understand Congress' grant of authority for the use of "necessary and appropriate force" to include the authority to detain for the duration of the relevant conflict, and our understanding is based on longstanding law-of-war principles. If the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war, that understanding may unravel. But that is not the situation we face as of this date. Active combat operations against Taliban fighters apparently are ongoing in Afghanistan. See, *e. g.*, Constable, U. S. Launches New Operation in Afghanistan, Washington Post, Mar. 14, 2004, p. A22 (reporting that 13,500 United States troops remain in Afghanistan, including several thousand new arrivals); Dept. of Defense, News Transcript, Gen. J. Abizaid Central Command Operations Update Briefing, Apr. 30, 2004, http://www.defenselink.mil/transcripts/2004/tr20040430-1402.html (as visited June 8, 2004, and available in Clerk of Court's case file) (media briefing describing ongoing operations in Afghanistan involving 20,000 United States troops). The United States may detain, for the duration of these hostilities, individuals legitimately determined to be Taliban combatants who "engaged in an armed conflict against the United States." If the record establishes that United States troops are still involved in active combat in Afghanistan, those detentions are part of the exercise of "necessary and appropriate force," and therefore are authorized by the AUMF.

*Ex parte Milligan*, 4 Wall. 2, 125 (1866), does not undermine our holding about the Government's authority to seize

enemy combatants, as we define that term today. In that case, the Court made repeated reference to the fact that its inquiry into whether the military tribunal had jurisdiction to try and punish Milligan turned in large part on the fact that Milligan was not a prisoner of war, but a resident of Indiana arrested while at home there. *Id.*, at 118, 131. That fact was central to its conclusion. Had Milligan been captured while he was assisting Confederate soldiers by carrying a rifle against Union troops on a Confederate battlefield, the holding of the Court might well have been different. The Court's repeated explanations that Milligan was not a prisoner of war suggest that had these different circumstances been present he could have been detained under military authority for the duration of the conflict, whether or not he was a citizen.[1]

Moreover, as JUSTICE SCALIA acknowledges, the Court in *Ex parte Quirin*, 317 U. S. 1 (1942), dismissed the language of *Milligan* that the petitioners had suggested prevented them from being subject to military process. *Post*, at 570 (dissenting opinion). Clear in this rejection was a disavowal of the New York State cases cited in *Milligan*, 4 Wall., at 128–129, on which JUSTICE SCALIA relies. See *ibid.* Both *Smith* v. *Shaw*, 12 Johns. *257 (N. Y. 1815), and *M'Connell* v. *Hampton*, 12 Johns. *234 (N. Y. 1815), were civil suits for false imprisonment. Even accepting that these cases once could have been viewed as standing for the sweeping proposition for which JUSTICE SCALIA cites them—that the military does not have authority to try an American citizen accused of spying against his country during wartime—*Quirin* makes undeniably clear that this is not the law today.

---

[1] Here the basis asserted for detention by the military is that Hamdi was carrying a weapon against American troops on a foreign battlefield; that is, that he was an enemy combatant. The legal category of enemy combatant has not been elaborated upon in great detail. The permissible bounds of the category will be defined by the lower courts as subsequent cases are presented to them.

Haupt, like the citizens in *Smith* and *M'Connell*, was accused of being a spy. The Court in *Quirin* found him "subject to trial and punishment by [a] military tribuna[l]" for those acts, and held that his citizenship did not change this result. 317 U. S., at 31, 37–38.

*Quirin* was a unanimous opinion. It both postdates and clarifies *Milligan*, providing us with the most apposite precedent that we have on the question of whether citizens may be detained in such circumstances. Brushing aside such precedent—particularly when doing so gives rise to a host of new questions never dealt with by this Court—is unjustified and unwise.

To the extent that JUSTICE SCALIA accepts the precedential value of *Quirin*, he argues that it cannot guide our inquiry here because "[i]n *Quirin* it was uncontested that the petitioners were members of enemy forces," while Hamdi challenges his classification as an enemy combatant. *Post*, at 571. But it is unclear why, in the paradigm outlined by JUSTICE SCALIA, such a concession should have any relevance. JUSTICE SCALIA envisions a system in which the only options are congressional suspension of the writ of habeas corpus or prosecution for treason or some other crime. *Post*, at 554. He does not explain how his historical analysis supports the addition of a third option—detention under some other process after concession of enemy-combatant status—or why a concession should carry any different effect than proof of enemy-combatant status in a proceeding that comports with due process. To be clear, our opinion only finds legislative authority to detain under the AUMF once it is sufficiently clear that the individual is, in fact, an enemy combatant; whether that is established by concession or by some other process that verifies this fact with sufficient certainty seems beside the point.

Further, JUSTICE SCALIA largely ignores the context of this case: a United States citizen captured in a *foreign* combat zone. JUSTICE SCALIA refers to only one case involv-

ing this factual scenario—a case in which a United States citizen-prisoner of war (a member of the Italian army) from World War II was seized on the battlefield in Sicily and then held in the United States. The court in that case held that the military detention of that United States citizen was lawful. See *In re Territo*, 156 F. 2d, at 148.

JUSTICE SCALIA's treatment of that case—in a footnote— suffers from the same defect as does his treatment of *Quirin:* Because JUSTICE SCALIA finds the fact of battlefield capture irrelevant, his distinction based on the fact that the petitioner "conceded" enemy-combatant status is beside the point. See *supra*, at 523. JUSTICE SCALIA can point to no case or other authority for the proposition that those captured on a foreign battlefield (whether detained there or in U. S. territory) cannot be detained outside the criminal process.

Moreover, JUSTICE SCALIA presumably would come to a different result if Hamdi had been kept in Afghanistan or even Guantanamo Bay. See *post*, at 577. This creates a perverse incentive. Military authorities faced with the stark choice of submitting to the full-blown criminal process or releasing a suspected enemy combatant captured on the battlefield will simply keep citizen-detainees abroad. Indeed, the Government transferred Hamdi from Guantanamo Bay to the United States naval brig only after it learned that he might be an American citizen. It is not at all clear why that should make a determinative constitutional difference.

### III

Even in cases in which the detention of enemy combatants is legally authorized, there remains the question of what process is constitutionally due to a citizen who disputes his enemy-combatant status. Hamdi argues that he is owed a meaningful and timely hearing and that "extra-judicial detention [that] begins and ends with the submission of an affidavit based on third-hand hearsay" does not comport with

the Fifth and Fourteenth Amendments. Brief for Petitioners 16. The Government counters that any more process than was provided below would be both unworkable and "constitutionally intolerable." Brief for Respondents 46. Our resolution of this dispute requires a careful examination both of the writ of habeas corpus, which Hamdi now seeks to employ as a mechanism of judicial review, and of the Due Process Clause, which informs the procedural contours of that mechanism in this instance.

A

Though they reach radically different conclusions on the process that ought to attend the present proceeding, the parties begin on common ground. All agree that, absent suspension, the writ of habeas corpus remains available to every individual detained within the United States. U. S. Const., Art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it"). Only in the rarest of circumstances has Congress seen fit to suspend the writ. See, e. g., Act of Mar. 3, 1863, ch. 81, § 1, 12 Stat. 755; Act of Apr. 20, 1871, ch. 22, § 4, 17 Stat. 14. At all other times, it has remained a critical check on the Executive, ensuring that it does not detain individuals except in accordance with law. See INS v. St. Cyr, 533 U. S. 289, 301 (2001). All agree suspension of the writ has not occurred here. Thus, it is undisputed that Hamdi was properly before an Article III court to challenge his detention under 28 U. S. C. § 2241. Brief for Respondents 12. Further, all agree that § 2241 and its companion provisions provide at least a skeletal outline of the procedures to be afforded a petitioner in federal habeas review. Most notably, § 2243 provides that "the person detained may, under oath, deny any of the facts set forth in the return or allege any other material facts," and § 2246 allows the taking of evidence in habeas proceedings by deposition, affidavit, or interrogatories.

The simple outline of §2241 makes clear both that Congress envisioned that habeas petitioners would have some opportunity to present and rebut facts and that courts in cases like this retain some ability to vary the ways in which they do so as mandated by due process. The Government recognizes the basic procedural protections required by the habeas statute, *id.*, at 37–38, but asks us to hold that, given both the flexibility of the habeas mechanism and the circumstances presented in this case, the presentation of the Mobbs Declaration to the habeas court completed the required factual development. It suggests two separate reasons for its position that no further process is due.

### B

First, the Government urges the adoption of the Fourth Circuit's holding below—that because it is "undisputed" that Hamdi's seizure took place in a combat zone, the habeas determination can be made purely as a matter of law, with no further hearing or factfinding necessary. This argument is easily rejected. As the dissenters from the denial of rehearing en banc noted, the circumstances surrounding Hamdi's seizure cannot in any way be characterized as "undisputed," as "those circumstances are neither conceded in fact, nor susceptible to concession in law, because Hamdi has not been permitted to speak for himself or even through counsel as to those circumstances." 337 F. 3d, at 357 (opinion of Luttig, J.); see also *id.*, at 371–372 (opinion of Motz, J.). Further, the "facts" that constitute the alleged concession are insufficient to support Hamdi's detention. Under the definition of enemy combatant that we accept today as falling within the scope of Congress' authorization, Hamdi would need to be "part of or supporting forces hostile to the United States or coalition partners" and "engaged in an armed conflict against the United States" to justify his detention in the United States for the duration of the relevant conflict. Brief for Respondents 3. The habeas petition states only that

"[w]hen seized by the United States Government, Mr. Hamdi resided in Afghanistan." App. 104. An assertion that one *resided* in a country in which combat operations are taking place is not a concession that one was "*captured* in a zone of active combat" operations in a foreign theater of war, 316 F. 3d, at 459 (emphasis added), and certainly is not a concession that one was "part of or supporting forces hostile to the United States or coalition partners" and "engaged in an armed conflict against the United States." Accordingly, we reject any argument that Hamdi has made concessions that eliminate any right to further process.

## C

The Government's second argument requires closer consideration. This is the argument that further factual exploration is unwarranted and inappropriate in light of the extraordinary constitutional interests at stake. Under the Government's most extreme rendition of this argument, "[r]espect for separation of powers and the limited institutional capabilities of courts in matters of military decisionmaking in connection with an ongoing conflict" ought to eliminate entirely any individual process, restricting the courts to investigating only whether legal authorization exists for the broader detention scheme. Brief for Respondents 26. At most, the Government argues, courts should review its determination that a citizen is an enemy combatant under a very deferential "some evidence" standard. *Id.*, at 34 ("Under the some evidence standard, the focus is exclusively on the factual basis supplied by the Executive to support its own determination" (citing *Superintendent, Mass. Correctional Institution at Walpole* v. *Hill*, 472 U. S. 445, 455–457 (1985) (explaining that the some evidence standard "does not require" a "weighing of the evidence," but rather calls for assessing "whether there is any evidence in the record that could support the conclusion"))). Under this review, a court would assume the accuracy of the Government's articulated

basis for Hamdi's detention, as set forth in the Mobbs Declaration, and assess only whether that articulated basis was a legitimate one. Brief for Respondents 36; see also 316 F. 3d, at 473–474 (declining to address whether the "some evidence" standard should govern the adjudication of such claims, but noting that "[t]he factual averments in the [Mobbs] affidavit, if accurate, are sufficient to confirm" the legality of Hamdi's detention).

In response, Hamdi emphasizes that this Court consistently has recognized that an individual challenging his detention may not be held at the will of the Executive without recourse to some proceeding before a neutral tribunal to determine whether the Executive's asserted justifications for that detention have basis in fact and warrant in law. See, e. g., Zadvydas v. Davis, 533 U. S. 678, 690 (2001); Addington v. Texas, 441 U. S. 418, 425–427 (1979). He argues that the Fourth Circuit inappropriately "ceded power to the Executive during wartime to define the conduct for which a citizen may be detained, judge whether that citizen has engaged in the proscribed conduct, and imprison that citizen indefinitely," Brief for Petitioners 21, and that due process demands that he receive a hearing in which he may challenge the Mobbs Declaration and adduce his own counterevidence. The District Court, agreeing with Hamdi, apparently believed that the appropriate process would approach the process that accompanies a criminal trial. It therefore disapproved of the hearsay nature of the Mobbs Declaration and anticipated quite extensive discovery of various military affairs. Anything less, it concluded, would not be "meaningful judicial review." App. 291.

Both of these positions highlight legitimate concerns. And both emphasize the tension that often exists between the autonomy that the Government asserts is necessary in order to pursue effectively a particular goal and the process that a citizen contends he is due before he is deprived of a constitutional right. The ordinary mechanism that we use

for balancing such serious competing interests, and for determining the procedures that are necessary to ensure that a citizen is not "deprived of life, liberty, or property, without due process of law," U. S. Const., Amdt. 5, is the test that we articulated in *Mathews* v. *Eldridge,* 424 U. S. 319 (1976). See, *e. g., Heller* v. *Doe,* 509 U. S. 312, 330–331 (1993); *Zinermon* v. *Burch,* 494 U. S. 113, 127–128 (1990); *United States* v. *Salerno,* 481 U. S. 739, 746 (1987); *Schall* v. *Martin,* 467 U. S. 253, 274–275 (1984); *Addington* v. *Texas, supra,* at 425. *Mathews* dictates that the process due in any given instance is determined by weighing "the private interest that will be affected by the official action" against the Government's asserted interest, "including the function involved" and the burdens the Government would face in providing greater process. 424 U. S., at 335. The *Mathews* calculus then contemplates a judicious balancing of these concerns, through an analysis of "the risk of an erroneous deprivation" of the private interest if the process were reduced and the "probable value, if any, of additional or substitute procedural safeguards." *Ibid.* We take each of these steps in turn.

1

It is beyond question that substantial interests lie on both sides of the scale in this case. Hamdi's "private interest . . . affected by the official action," *ibid.,* is the most elemental of liberty interests—the interest in being free from physical detention by one's own government. *Foucha* v. *Louisiana,* 504 U. S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action"); see also *Parham* v. *J. R.,* 442 U. S. 584, 600 (1979) (noting the "substantial liberty interest in not being confined unnecessarily"). "In our society liberty is the norm," and detention without trial "is the carefully limited exception." *Salerno, supra,* at 755. "We have always been careful not to 'minimize the importance and fundamental nature' of the individu-

al's right to liberty," *Foucha, supra,* at 80 (quoting *Salerno, supra,* at 750), and we will not do so today.

Nor is the weight on this side of the *Mathews* scale offset by the circumstances of war or the accusation of treasonous behavior, for "[i]t is clear that commitment for *any* purpose constitutes a significant deprivation of liberty that requires due process protection," *Jones* v. *United States,* 463 U. S. 354, 361 (1983) (emphasis added; internal quotation marks omitted), and at this stage in the *Mathews* calculus, we consider the interest of the *erroneously* detained individual. *Carey* v. *Piphus,* 435 U. S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property"); see also *id.,* at 266 (noting "the importance to organized society that procedural due process be observed," and emphasizing that "the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions"). Indeed, as *amicus* briefs from media and relief organizations emphasize, the risk of erroneous deprivation of a citizen's liberty in the absence of sufficient process here is very real. See Brief for AmeriCares et al. as *Amici Curiae* 13–22 (noting ways in which "[t]he nature of humanitarian relief work and journalism present a significant risk of mistaken military detentions"). Moreover, as critical as the Government's interest may be in detaining those who actually pose an immediate threat to the national security of the United States during ongoing international conflict, history and common sense teach us that an unchecked system of detention carries the potential to become a means for oppression and abuse of others who do not present that sort of threat. See *Ex parte Milligan,* 4 Wall., at 125 ("[The Founders] knew—the history of the world told them—the nation they were founding, be its existence short or long, would be involved in war; how often or how long continued, human foresight could not tell; and that unlimited power, wherever lodged at such a time,

was especially hazardous to freemen"). Because we live in a society in which "[m]ere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty," *O'Connor* v. *Donaldson*, 422 U. S. 563, 575 (1975), our starting point for the *Mathews* v. *Eldridge* analysis is unaltered by the allegations surrounding the particular detainee or the organizations with which he is alleged to have associated. We reaffirm today the fundamental nature of a citizen's right to be free from involuntary confinement by his own government without due process of law, and we weigh the opposing governmental interests against the curtailment of liberty that such confinement entails.

### 2

On the other side of the scale are the weighty and sensitive governmental interests in ensuring that those who have in fact fought with the enemy during a war do not return to battle against the United States. As discussed above, *supra,* at 518, the law of war and the realities of combat may render such detentions both necessary and appropriate, and our due process analysis need not blink at those realities. Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them. *Department of Navy* v. *Egan*, 484 U. S. 518, 530 (1988) (noting the reluctance of the courts "to intrude upon the authority of the Executive in military and national security affairs"); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 587 (1952) (acknowledging "broad powers in military commanders engaged in day-to-day fighting in a theater of war").

The Government also argues at some length that its interests in reducing the process available to alleged enemy combatants are heightened by the practical difficulties that would accompany a system of trial-like process. In its view, military officers who are engaged in the serious work of wag-

ing battle would be unnecessarily and dangerously distracted by litigation half a world away, and discovery into military operations would both intrude on the sensitive secrets of national defense and result in a futile search for evidence buried under the rubble of war. Brief for Respondents 46–49. To the extent that these burdens are triggered by heightened procedures, they are properly taken into account in our due process analysis.

3

Striking the proper constitutional balance here is of great importance to the Nation during this period of ongoing combat. But it is equally vital that our calculus not give short shrift to the values that this country holds dear or to the privilege that is American citizenship. It is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad. See *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 164–165 (1963) ("The imperative necessity for safeguarding these rights to procedural due process under the gravest of emergencies has existed throughout our constitutional history, for it is then, under the pressing exigencies of crisis, that there is the greatest temptation to dispense with fundamental constitutional guarantees which, it is feared, will inhibit governmental action"); see also *United States* v. *Robel*, 389 U. S. 258, 264 (1967) ("It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties . . . which makes the defense of the Nation worthwhile").

With due recognition of these competing concerns, we believe that neither the process proposed by the Government nor the process apparently envisioned by the District Court below strikes the proper constitutional balance when a United States citizen is detained in the United States as an enemy combatant. That is, "the risk of an erroneous depri-

vation" of a detainee's liberty interest is unacceptably high under the Government's proposed rule, while some of the "additional or substitute procedural safeguards" suggested by the District Court are unwarranted in light of their limited "probable value" and the burdens they may impose on the military in such cases. *Mathews,* 424 U. S., at 335.

We therefore hold that a citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker. See *Cleveland Bd. of Ed.* v. *Loudermill,* 470 U. S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case'" (quoting *Mullane* v. *Central Hanover Bank & Trust Co.,* 339 U. S. 306, 313 (1950))); *Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.,* 508 U. S. 602, 617 (1993) ("due process requires a 'neutral and detached judge in the first instance'" (quoting *Ward* v. *Monroeville,* 409 U. S. 57, 61–62 (1972))). "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.' It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'" *Fuentes* v. *Shevin,* 407 U. S. 67, 80 (1972) (quoting *Baldwin* v. *Hale,* 1 Wall. 223, 233 (1864); *Armstrong* v. *Manzo,* 380 U. S. 545, 552 (1965) (other citations omitted)). These essential constitutional promises may not be eroded.

At the same time, the exigencies of the circumstances may demand that, aside from these core elements, enemy-combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict. Hearsay, for example, may need to be

accepted as the most reliable available evidence from the Government in such a proceeding. Likewise, the Constitution would not be offended by a presumption in favor of the Government's evidence, so long' as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided. Thus, once the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria. A burden-shifting scheme of this sort would meet the goal of ensuring that the errant tourist, embedded journalist, or local aid worker has a chance to prove military error while giving due regard to the Executive once it has put forth meaningful support for its conclusion that the detainee is in fact an enemy combatant. In the words of *Mathews*, process of this sort would sufficiently address the "risk of an erroneous deprivation" of a detainee's liberty interest while eliminating certain procedures that have questionable additional value in light of the burden on the Government. 424 U. S., at 335.[2]

We think it unlikely that this basic process will have the dire impact on the central functions of warmaking that the Government forecasts. The parties agree that initial captures on the battlefield need not receive the process we have discussed here; that process is due only when the determination is made to *continue* to hold those who have been seized. The Government has made clear in its briefing that documentation regarding battlefield detainees already is kept in the ordinary course of military affairs. Brief for Respondents 3–4. Any factfinding imposition created by requiring a knowledgeable affiant to summarize these records to an independent tribunal is a minimal one. Likewise, arguments

---

[2] Because we hold that Hamdi is constitutionally entitled to the process described above, we need not address at this time whether any treaty guarantees him similar access to a tribunal for a determination of his status.

that military officers ought not have to wage war under the threat of litigation lose much of their steam when factual disputes at enemy-combatant hearings are limited to the alleged combatant's acts. This focus meddles little, if at all, in the strategy or conduct of war, inquiring only into the appropriateness of continuing to detain an individual claimed to have taken up arms against the United States. While we accord the greatest respect and consideration to the judgments of military authorities in matters relating to the actual prosecution of a war, and recognize that the scope of that discretion necessarily is wide, it does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims like those presented here. Cf. *Korematsu* v. *United States*, 323 U. S. 214, 233–234 (1944) (Murphy, J., dissenting) ("[L]ike other claims conflicting with the asserted constitutional rights of the individual, the military claim must subject itself to the judicial process of having its reasonableness determined and its conflicts with other interests reconciled"); *Sterling* v. *Constantin*, 287 U. S. 378, 401 (1932) ("What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions").

In sum, while the full protections that accompany challenges to detentions in other settings may prove unworkable and inappropriate in the enemy-combatant setting, the threats to military operations posed by a basic system of independent review are not so weighty as to trump a citizen's core rights to challenge meaningfully the Government's case and to be heard by an impartial adjudicator.

### D

In so holding, we necessarily reject the Government's assertion that separation of powers principles mandate a heavily circumscribed role for the courts in such circumstances. Indeed, the position that the courts must forgo any examina-

tion of the individual case and focus exclusively on the legality of the broader detention scheme cannot be mandated by any reasonable view of separation of powers, as this approach serves only to *condense* power into a single branch of government. We have long since made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens. *Youngstown Sheet & Tube*, 343 U. S., at 587. Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake. *Mistretta v. United States*, 488 U. S. 361, 380 (1989) (it was "the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty"); *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 426 (1934) (The war power "is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme cooperative effort to preserve the nation. But even the war power does not remove constitutional limitations safeguarding essential liberties"). Likewise, we have made clear that, unless Congress acts to suspend it, the Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining this delicate balance of governance, serving as an important judicial check on the Executive's discretion in the realm of detentions. See *St. Cyr*, 533 U. S., at 301 ("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest"). Thus, while we do not question that our due process assessment must pay keen attention to the particular burdens faced by the Executive in the context of military action, it would turn our system of checks and balances on its head to suggest that a citizen could not make his way to court

with a challenge to the factual basis for his detention by his Government, simply because the Executive opposes making available ·such a challenge. Absent suspension of the writ by Congress, a citizen detained as an enemy combatant is entitled to this process.

Because we conclude that due process demands some system for a citizen-detainee to refute his classification, the proposed "some evidence" standard is inadequate. Any process in which the Executive's factual assertions go wholly unchallenged or are simply presumed correct without any opportunity for the alleged combatant to demonstrate otherwise falls constitutionally short. As the Government itself has recognized, we have utilized the "some evidence" standard in the past as a standard of review, not as a standard of proof. Brief for Respondents 35. That is, it primarily has been employed by courts in examining an administrative record developed after an adversarial proceeding—one with process at least of the sort that we today hold is constitutionally mandated in the citizen enemy-combatant setting. See, e. g., St. Cyr, supra; Hill, 472 U. S., at 455–457. This standard therefore is ill suited to the situation in which a habeas petitioner has received no prior proceedings before any tribunal and had no prior opportunity to rebut the Executive's factual assertions before a neutral decisionmaker.

Today we are faced only with such a case. Aside from unspecified "screening" processes, Brief for Respondents 3–4, and military interrogations in which the Government suggests Hamdi could have contested his classification, Tr. of Oral Arg. 40, 42, Hamdi has received no process. An interrogation by one's captor, however effective an intelligence-gathering tool, hardly constitutes a constitutionally adequate factfinding before a neutral decisionmaker. Compare Brief for Respondents 42–43 (discussing the "secure interrogation environment," and noting that military interrogations require a controlled "interrogation dynamic" and "a relationship of trust and dependency" and are "a critical source" of

"timely and effective intelligence") with *Concrete Pipe*, 508 U. S., at 617–618 ("[O]ne is entitled as a matter of due process of law to an adjudicator who is not in a situation which would offer a possible temptation to the average man as a judge . . . which might lead him not to hold the balance nice, clear and true" (internal quotation marks omitted)). That even purportedly fair adjudicators "are disqualified by their interest in the controversy to be decided is, of course, the general rule." *Tumey* v. *Ohio*, 273 U. S. 510, 522 (1927). Plainly, the "process" Hamdi has received is not that to which he is entitled under the Due Process Clause.

There remains the possibility that the standards we have articulated could be met by an appropriately authorized and properly constituted military tribunal. Indeed, it is notable that military regulations already provide for such process in related instances, dictating that tribunals be made available to determine the status of enemy detainees who assert prisoner-of-war status under the Geneva Convention. See Headquarters Depts. of Army, Navy, Air Force, and Marine Corps, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, Army Regulation 190–8, ch. 1, § 1–6 (1997). In the absence of such process, however, a court that receives a petition for a writ of habeas corpus from an alleged enemy combatant must itself ensure that the minimum requirements of due process are achieved. Both courts below recognized as much, focusing their energies on the question of whether Hamdi was due an opportunity to rebut the Government's case against him. The Government, too, proceeded on this assumption, presenting its affidavit and then seeking that it be evaluated under a deferential standard of review based on burdens that it alleged would accompany any greater process. As we have discussed, a habeas court in a case such as this may accept affidavit evidence like that contained in the Mobbs Declaration, so long as it also permits the alleged combatant to present his own factual case to rebut the Government's return. We antici-

pate that a District Court would proceed with the caution that we have indicated is necessary in this setting, engaging in a factfinding process that is both prudent and incremental. We have no reason to doubt that courts faced with these sensitive matters will pay proper heed both to the matters of national security that might arise in an individual case and to the constitutional limitations safeguarding essential liberties that remain vibrant even in times of security concerns.

## IV

Hamdi asks us to hold that the Fourth Circuit also erred by denying him immediate access to counsel upon his detention and by disposing of the case without permitting him to meet with an attorney. Brief for Petitioners 19. Since our grant of certiorari in this case, Hamdi has been appointed counsel, with whom he has met for consultation purposes on several occasions, and with whom he is now being granted unmonitored meetings. He unquestionably has the right to access to counsel in connection with the proceedings on remand. No further consideration of this issue is necessary at this stage of the case.

\*　　\*　　\*

The judgment of the United States Court of Appeals for the Fourth Circuit is vacated, and the case is remanded for further proceedings.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins, concurring in part, dissenting in part, and concurring in the judgment.

According to Yaser Hamdi's petition for writ of habeas corpus, brought on his behalf by his father, the Government of the United States is detaining him, an American citizen on American soil, with the explanation that he was seized on the field of battle in Afghanistan, having been on the enemy side. It is undisputed that the Government has not charged

him with espionage, treason, or any other crime under domestic law. It is likewise undisputed that for one year and nine months, on the basis of an Executive designation of Hamdi as an "enemy combatant," the Government denied him the right to send or receive any communication beyond the prison where he was held and, in particular, denied him access to counsel to represent him.[1] The Government asserts a right to hold Hamdi under these conditions indefinitely, that is, until the Government determines that the United States is no longer threatened by the terrorism exemplified in the attacks of September 11, 2001.

In these proceedings on Hamdi's petition, he seeks to challenge the facts claimed by the Government as the basis for holding him as an enemy combatant. And in this Court he presses the distinct argument that the Government's claim, even if true, would not implicate any authority for holding him that would satisfy 18 U. S. C. § 4001(a) (Non-Detention Act), which bars imprisonment or detention of a citizen "except pursuant to an Act of Congress."

The Government responds that Hamdi's incommunicado imprisonment as an enemy combatant seized on the field of battle falls within the President's power as Commander in Chief under the laws and usages of war, and is in any event authorized by two statutes. Accordingly, the Government contends that Hamdi has no basis for any challenge by petition for habeas except to his own status as an enemy combatant; and even that challenge may go no further than to enquire whether "some evidence" supports Hamdi's designation, see Brief for Respondents 34–36; if there is "some evidence," Hamdi should remain locked up at the discretion of the Executive. At the argument of this case, in fact, the Government went further and suggested that as long as a prisoner could challenge his enemy combatant des-

---

[1] The Government has since February 2004 permitted Hamdi to consult with counsel as a matter of policy, but does not concede that it has an obligation to allow this. Brief for Respondents 9, 39–46.

ignation when responding to interrogation during incommunicado detention he was accorded sufficient process to support his designation as an enemy combatant. See Tr. of Oral Arg. 40; *id.*, at 42 ("[H]e has an opportunity to explain it in his own words" "[d]uring interrogation"). Since on either view judicial enquiry so limited would be virtually worthless as a way to contest detention, the Government's concession of jurisdiction to hear Hamdi's habeas claim is more theoretical than practical, leaving the assertion of Executive authority close to unconditional.

The plurality rejects any such limit on the exercise of habeas jurisdiction and so far I agree with its opinion. The plurality does, however, accept the Government's position that if Hamdi's designation as an enemy combatant is correct, his detention (at least as to some period) is authorized by an Act of Congress as required by § 4001(a), that is, by the Authorization for Use of Military Force, 115 Stat. 224 (hereinafter Force Resolution). *Ante*, at 517–521. Here, I disagree and respectfully dissent. The Government has failed to demonstrate that the Force Resolution authorizes the detention complained of here even on the facts the Government claims. If the Government raises nothing further than the record now shows, the Non-Detention Act entitles Hamdi to be released.

I

The Government's first response to Hamdi's claim that holding him violates § 4001(a), prohibiting detention of citizens "except pursuant to an Act of Congress," is that the statute does not even apply to military wartime detentions, being beyond the sphere of domestic criminal law. Next, the Government says that even if that statute does apply, two Acts of Congress provide the authority § 4001(a) demands: a general authorization to the Department of Defense to pay for detaining "prisoners of war" and "similar" persons, 10 U. S. C. § 956(5), and the Force Resolution, passed after the attacks of 2001. At the same time, the Government-

ment argues that in detaining Hamdi in the manner described, the President is in any event acting as Commander in Chief under Article II of the Constitution, which brings with it the right to invoke authority under the accepted customary rules for waging war. On the record in front of us, the Government has not made out a case on any theory.

## II

The threshold issue is how broadly or narrowly to read the Non-Detention Act, the tone of which is severe: "No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." 18 U. S. C. § 4001(a). Should the severity of the Act be relieved when the Government's stated factual justification for incommunicado detention is a war on terrorism, so that the Government may be said to act "pursuant" to congressional terms that fall short of explicit authority to imprison individuals? With one possible though important qualification, see *infra*, at 548–549, the answer has to be no. For a number of reasons, the prohibition within § 4001(a) has to be read broadly to accord the statute a long reach and to impose a burden of justification on the Government.

First, the circumstances in which the Act was adopted point the way to this interpretation. The provision superseded a cold-war statute, the Emergency Detention Act of 1950 (formerly 50 U. S. C. § 811 *et seq.* (1970 ed.)), which had authorized the Attorney General, in time of emergency, to detain anyone reasonably thought likely to engage in espionage or sabotage. That statute was repealed in 1971 out of fear that it could authorize a repetition of the World War II internment of citizens of Japanese ancestry; Congress meant to preclude another episode like the one described in *Korematsu* v. *United States*, 323 U. S. 214 (1944). See H. R. Rep. No. 92–116, pp. 2, 4–5 (1971). While Congress might simply have struck the 1950 statute, in considering the repealer the point was made that the existing statute provided some ex-

press procedural protection, without which the Executive would seem to be subject to no statutory limits protecting individual liberty. See *id.*, at 5 (mere repeal "might leave citizens subject to arbitrary executive action, with no clear demarcation of the limits of executive authority"); 117 Cong. Rec. 31544 (1971) (Emergency Detention Act "remains as the only existing barrier against the future exercise of executive power which resulted in" the Japanese internment); cf. *id.*, at 31548 (in the absence of further procedural provisions, even § 4001(a) "will virtually leave us stripped naked against the great power . . . which the President has"). It was in these circumstances that a proposed limit on Executive action was expanded to the inclusive scope of § 4001(a) as enacted.

The fact that Congress intended to guard against a repetition of the World War II internments when it repealed the 1950 statute and gave us § 4001(a) provides a powerful reason to think that § 4001(a) was meant to require clear congressional authorization before any citizen can be placed in a cell. It is not merely that the legislative history shows that § 4001(a) was thought necessary in anticipation of times just like the present, in which the safety of the country is threatened. To appreciate what is most significant, one must only recall that the internments of the 1940s were accomplished by Executive action. Although an Act of Congress ratified and confirmed an Executive order authorizing the military to exclude individuals from defined areas and to accommodate those it might remove, see *Ex parte Endo*, 323 U. S. 283, 285–288 (1944), the statute said nothing whatever about the detention of those who might be removed, *id.*, at 300–301; internment camps were creatures of the Executive, and confinement in them rested on assertion of Executive authority, see *id.*, at 287–293. When, therefore, Congress repealed the 1950 Act and adopted § 4001(a) for the purpose of avoiding another *Korematsu*, it intended to preclude reliance on vague congressional authority (for example, providing "ac-

commodations" for those subject to removal) as authority for detention or imprisonment at the discretion of the Executive (maintaining detention camps of American citizens, for example). In requiring that any Executive detention be "pursuant to an Act of Congress," then, Congress necessarily meant to require a congressional enactment that clearly authorized detention or imprisonment.

Second, when Congress passed § 4001(a) it was acting in light of an interpretive regime that subjected enactments limiting liberty in wartime to the requirement of a clear statement and it presumably intended § 4001(a) to be read accordingly. This need for clarity was unmistakably expressed in *Ex parte Endo, supra,* decided the same day as *Korematsu. Endo* began with a petition for habeas corpus by an interned citizen claiming to be loyal and law-abiding and thus "unlawfully detained." 323 U. S., at 294. The petitioner was held entitled to habeas relief in an opinion that set out this principle for scrutinizing wartime statutes in derogation of customary liberty:

> "In interpreting a wartime measure we must assume that [its] purpose was to allow for the greatest possible accommodation between . . . liberties and the exigencies of war. We must assume, when asked to find implied powers in a grant of legislative or executive authority, that the law makers intended to place no greater restraint on the citizen than was clearly and unmistakably indicated by the language they used." *Id.,* at 300.

Congress's understanding of the need for clear authority before citizens are kept detained is itself therefore clear, and § 4001(a) must be read to have teeth in its demand for congressional authorization.

Finally, even if history had spared us the cautionary example of the internments in World War II, even if there had been no *Korematsu,* and *Endo* had set out no principle of statutory interpretation, there would be a compelling reason

to read § 4001(a) to demand manifest authority to detain before detention is authorized. The defining character of American constitutional government is its constant tension between security and liberty, serving both by partial helpings of each. In a government of separated powers, deciding finally on what is a reasonable degree of guaranteed liberty whether in peace or war (or some condition in between) is not well entrusted to the Executive Branch of Government, whose particular responsibility is to maintain security. For reasons of inescapable human nature, the branch of the Government asked to counter a serious threat is not the branch on which to rest the Nation's entire reliance in striking the balance between the will to win and the cost in liberty on the way to victory; the responsibility for security will naturally amplify the claim that security legitimately raises. A reasonable balance is more likely to be reached on the judgment of a different branch, just as Madison said in remarking that "the constant aim is to divide and arrange the several offices in such a manner as that each may be a check on the other—that the private interest of every individual may be a sentinel over the public rights." The Federalist No. 51, p. 349 (J. Cooke ed. 1961). Hence the need for an assessment by Congress before citizens are subject to lockup, and likewise the need for a clearly expressed congressional resolution of the competing claims.

## III

Under this principle of reading § 4001(a) robustly to require a clear statement of authorization to detain, none of the Government's arguments suffices to justify Hamdi's detention.

## A

First, there is the argument that § 4001(a) does not even apply to wartime military detentions, a position resting on the placement of § 4001(a) in Title 18 of the United States Code, the gathering of federal criminal law. The text of the

statute does not, however, so limit its reach, and the legislative history of the provision shows its placement in Title 18 was not meant to render the statute more restricted than its terms. The draft of what is now § 4001(a) as contained in the original bill prohibited only imprisonment unauthorized by Title 18. See H. R. Rep. No. 92–116, at 4. In response to the Department of Justice's objection that the original draft seemed to assume wrongly that all provisions for the detention of convicted persons would be contained in Title 18, the provision was amended by replacing a reference to that title with the reference to an "Act of Congress." *Id.*, at 3. The Committee on the Judiciary, discussing this change, stated that "[limiting] detention of citizens . . . to situations in which . . . an Act of Congres[s] exists" would "assure that no detention camps can be established without at least the acquiescence of the Congress." *Id.*, at 5. See also *supra*, at 542–544. This understanding, that the amended bill would sweep beyond imprisonment for crime and apply to Executive detention in furtherance of wartime security, was emphasized in an extended debate. Representative Ichord, chairman of the House Internal Security Committee and an opponent of the bill, feared that the redrafted statute would "deprive the President of his emergency powers and his most effective means of coping with sabotage and espionage agents in war-related crises." 117 Cong. Rec., at 31542. Representative Railsback, the bill's sponsor, spoke of the bill in absolute terms: "[I]n order to prohibit arbitrary executive action, [the bill] assures that no detention of citizens can be undertaken by the Executive without the prior consent of the Congress." *Id.*, at 31551. This legislative history indicates that Congress was aware that § 4001(a) would limit the Executive's power to detain citizens in wartime to protect national security, and it is fair to say that the prohibition was thus intended to extend not only to the exercise of power to vindicate the interests underlying domestic criminal law, but to statutorily unauthor-

ized detention by the Executive for reasons of security in wartime, just as Hamdi claims.[2]

## B

Next, there is the Government's claim, accepted by the plurality, that the terms of the Force Resolution are adequate to authorize detention of an enemy combatant under the circumstances described,[3] a claim the Government fails to support sufficiently to satisfy § 4001(a) as read to require a clear statement of authority to detain. Since the Force Resolution was adopted one week after the attacks of September 11, 2001, it naturally speaks with some generality, but its focus is clear, and that is on the use of military power. It is fairly read to authorize the use of armies and weapons, whether against other armies or individual terrorists. But, like the statute discussed in *Endo*, it never so much as uses the word detention, and there is no reason to think Congress might have perceived any need to augment Executive power to deal with dangerous citizens within the United States, given the well-stocked statutory arsenal of defined criminal offenses covering the gamut of actions that a citizen sympathetic to terrorists might commit. See, *e. g.*, 18 U. S. C.

---

[2] Nor is it possible to distinguish between civilian and military authority to detain based on the congressional object of avoiding another *Korematsu* v. *United States*, 323 U. S. 214 (1944). See Brief for Respondents 21 (arguing that military detentions are exempt). Although a civilian agency authorized by Executive order ran the detention camps, the relocation and detention of American citizens was ordered by the military under authority of the President as Commander in Chief. See *Ex parte Endo*, 323 U. S. 283, 285–288 (1944). The World War II internment was thus ordered under the same Presidential power invoked here and the intent to bar a repetition goes to the action taken and authority claimed here.

[3] As noted, *supra*, at 541, the Government argues that a required Act of Congress is to be found in a statutory authorization to spend money appropriated for the care of prisoners of war and of other, similar prisoners, 10 U. S. C. § 956(5). It is enough to say that this statute is an authorization to spend money if there are prisoners, not an authorization to imprison anyone to provide the occasion for spending money.

§ 2339A (material support for various terrorist acts); § 2339B (material support to a foreign terrorist organization); § 2332a (use of a weapon of mass destruction, including conspiracy and attempt); § 2332b(a)(1) (acts of terrorism "transcending national boundaries," including threats, conspiracy, and attempt); § 2339C (2000 ed., Supp. II) (financing of certain terrorist acts); see also § 3142(e) (pretrial detention). See generally Brief for Janet Reno et al. as *Amici Curiae* in *Rumsfeld* v. *Padilla*, O. T. 2003, No. 03–1027, pp. 14–19, and n. 17 (listing the tools available to the Executive to fight terrorism even without the power the Government claims here); Brief for Louis Henkin et al. as *Amici Curiae* in *Rumsfeld* v. *Padilla*, O. T. 2003, No. 03–1027, p. 23, n. 27.[4]

## C

Even so, there is one argument for treating the Force Resolution as sufficiently clear to authorize detention of a citizen consistently with § 4001(a). Assuming the argument to be sound, however, the Government is in no position to claim its advantage.

Because the Force Resolution authorizes the use of military force in acts of war by the United States, the argument goes, it is reasonably clear that the military and its Commander in Chief are authorized to deal with enemy belligerents according to the treaties and customs known collectively as the laws of war. Brief for Respondents 20– 22; see *ante*, at 517–521 (accepting this argument). Accordingly, the United States may detain captured enemies, and *Ex parte Quirin,* 317 U. S. 1 (1942), may perhaps be claimed for the proposition that the American citizenship of such a captive does not as such limit the Government's power to deal with

---

[4] Even a brief examination of the reported cases in which the Government has chosen to proceed criminally against those who aided the Taliban shows the Government has found no shortage of offenses to allege. See *United States* v. *Lindh,* 212 F. Supp. 2d 541, 547 (ED Va. 2002); *United States* v. *Khan,* 309 F. Supp. 2d 789, 796 (ED Va. 2004).

him under the usages of war.  *Id.*, at 31, 37–38.  Thus, the Government here repeatedly argues that Hamdi's detention amounts to nothing more than customary detention of a captive taken on the field of battle: if the usages of war are fairly authorized by the Force Resolution, Hamdi's detention is authorized for purposes of § 4001(a).

There is no need, however, to address the merits of such an argument in all possible circumstances.  For now it is enough to recognize that the Government's stated legal position in its campaign against the Taliban (among whom Hamdi was allegedly captured) is apparently at odds with its claim here to be acting in accordance with customary law of war and hence to be within the terms of the Force Resolution in its detention of Hamdi.  In a statement of its legal position cited in its brief, the Government says that "the Geneva Convention applies to the Taliban detainees."  Office of the White House Press Secretary, Fact Sheet, Status of Detainees at Guantanamo (Feb. 7, 2002), www.whitehouse.gov/news/releases/2002/02/20020207-13.html (as visited June 18, 2004, and available in Clerk of Court's case file) (hereinafter White House Press Release) (cited in Brief for Respondents 24, n. 9).  Hamdi presumably is such a detainee, since according to the Government's own account, he was taken bearing arms on the Taliban side of a field of battle in Afghanistan.  He would therefore seem to qualify for treatment as a prisoner of war under the Third Geneva Convention, to which the United States is a party.  Article 4 of the Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, [1955] 6 U. S. T. 3316, 3320, T. I. A. S. No. 3364.

By holding him incommunicado, however, the Government obviously has not been treating him as a prisoner of war, and in fact the Government claims that no Taliban detainee is entitled to prisoner of war status.  See Brief for Respondents 24; White House Press Release.  This treatment appears to be a violation of the Geneva Convention provision

that even in cases of doubt, captives are entitled to be treated as prisoners of war "until such time as their status has been determined by a competent tribunal." Art. 5, 6 U. S. T., at 3324. The Government answers that the President's determination that Taliban detainees do not qualify as prisoners of war is conclusive as to Hamdi's status and removes any doubt that would trigger application of the Convention's tribunal requirement. See Brief for Respondents 24. But reliance on this categorical pronouncement to settle doubt is apparently at odds with the military regulation, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, Army Regulation 190–8, ch. 1, §§ 1–5, 1–6 (1997), adopted to implement the Geneva Convention, and setting out a detailed procedure for a military tribunal to determine an individual's status. See, e. g., id., § 1–6 ("A competent tribunal shall be composed of three commissioned officers"; a "written record shall be made of proceedings"; "[p]roceedings shall be open" with certain exceptions; "[p]ersons whose status is to be determined shall be advised of their rights at the beginning of their hearings," "allowed to attend all open sessions," "allowed to call witnesses if reasonably available, and to question those witnesses called by the Tribunal," and to "have a right to testify"; and a tribunal shall determine status by a "[p]reponderance of evidence"). One of the types of doubt these tribunals are meant to settle is whether a given individual may be, as Hamdi says he is, an "[i]nnocent civilian who should be immediately returned to his home or released." Id., § 1–6e(10)(c). The regulation, jointly promulgated by the Headquarters of the Departments of the Army, Navy, Air Force, and Marine Corps, provides that "[p]ersons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed." Id., § 1–6g. The regulation

also incorporates the Geneva Convention's presumption that in cases of doubt, "persons shall enjoy the protection of the . . . Convention until such time as their status has been determined by a competent tribunal." *Id.*, § 1–6a. Thus, there is reason to question whether the United States is acting in accordance with the laws of war it claims as authority.

Whether, or to what degree, the Government is in fact violating the Geneva Convention and is thus acting outside the customary usages of war are not matters I can resolve at this point. What I can say, though, is that the Government has not made out its claim that in detaining Hamdi in the manner described, it is acting in accord with the laws of war authorized to be applied against citizens by the Force Resolution. I conclude accordingly that the Government has failed to support the position that the Force Resolution authorizes the described detention of Hamdi for purposes of § 4001(a).

It is worth adding a further reason for requiring the Government to bear the burden of clearly justifying its claim to be exercising recognized war powers before declaring § 4001(a) satisfied. Thirty-eight days after adopting the Force Resolution, Congress passed the statute entitled Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT ACT), 115 Stat. 272; that Act authorized the detention of alien terrorists for no more than seven days in the absence of criminal charges or deportation proceedings, 8 U. S. C. § 1226a(a)(5) (2000 ed., Supp. I). It is very difficult to believe that the same Congress that carefully circumscribed Executive power over alien terrorists on home soil would not have meant to require the Government to justify clearly its detention of an American citizen held on home soil incommunicado.

### D

Since the Government has given no reason either to deflect the application of § 4001(a) or to hold it to be satisfied, I need

to go no further; the Government hints of a constitutional challenge to the statute, but it presents none here. I will, however, stray across the line between statutory and constitutional territory just far enough to note the weakness of the Government's mixed claim of inherent, extrastatutory authority under a combination of Article II of the Constitution and the usages of war. It is in fact in this connection that the Government developed its argument that the exercise of war powers justifies the detention, and what I have just said about its inadequacy applies here as well. Beyond that, it is instructive to recall Justice Jackson's observation that the President is not Commander in Chief of the country, only of the military. *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 643–644 (1952) (concurring opinion); see also *id.*, at 637–638 (Presidential authority is "at its lowest ebb" where the President acts contrary to congressional will).

There may be room for one qualification to Justice Jackson's statement, however: in a moment of genuine emergency, when the Government must act with no time for deliberation, the Executive may be able to detain a citizen if there is reason to fear he is an imminent threat to the safety of the Nation and its people (though I doubt there is any want of statutory authority, see *supra*, at 547–548). This case, however, does not present that question, because an emergency power of necessity must at least be limited by the emergency; Hamdi has been locked up for over two years. Cf. *Ex parte Milligan*, 4 Wall. 2, 127 (1866) (martial law justified only by "actual and present" necessity as in a genuine invasion that closes civilian courts).

Whether insisting on the careful scrutiny of emergency claims or on a vigorous reading of § 4001(a), we are heirs to a tradition given voice 800 years ago by Magna Carta, which, on the barons' insistence, confined executive power by "the law of the land."

## IV

Because I find Hamdi's detention forbidden by § 4001(a) and unauthorized by the Force Resolution, I would not reach any questions of what process he may be due in litigating disputed issues in a proceeding under the habeas statute or prior to the habeas enquiry itself. For me, it suffices that the Government has failed to justify holding him in the absence of a further Act of Congress, criminal charges, a showing that the detention conforms to the laws of war, or a demonstration that § 4001(a) is unconstitutional. I would therefore vacate the judgment of the Court of Appeals and remand for proceedings consistent with this view.

Since this disposition does not command a majority of the Court, however, the need to give practical effect to the conclusions of eight Members of the Court rejecting the Government's position calls for me to join with the plurality in ordering remand on terms closest to those I would impose. See *Screws* v. *United States*, 325 U. S. 91, 134 (1945) (Rutledge, J., concurring in result). Although I think litigation of Hamdi's status as an enemy combatant is unnecessary, the terms of the plurality's remand will allow Hamdi to offer evidence that he is not an enemy combatant, and he should at the least have the benefit of that opportunity.

It should go without saying that in joining with the plurality to produce a judgment, I do not adopt the plurality's resolution of constitutional issues that I would not reach. It is not that I could disagree with the plurality's determinations (given the plurality's view of the Force Resolution) that someone in Hamdi's position is entitled at a minimum to notice of the Government's claimed factual basis for holding him, and to a fair chance to rebut it before a neutral decisionmaker, see *ante*, at 533; nor, of course, could I disagree with the plurality's affirmation of Hamdi's right to counsel, see *ante*, at 539. On the other hand, I do not mean to imply agreement that the Government could claim an evidentiary presumption casting the burden of rebuttal on

Hamdi, see *ante*, at 534, or that an opportunity to litigate before a military tribunal might obviate or truncate enquiry by a court on habeas, see *ante*, at 538.

 Subject to these qualifications, I join with the plurality in a judgment of the Court vacating the Fourth Circuit's judgment and remanding the case.

JUSTICE SCALIA, with whom JUSTICE STEVENS joins, dissenting.

Petitioner Yaser Hamdi, a presumed American citizen, has been imprisoned without charge or hearing in the Norfolk and Charleston Naval Brigs for more than two years, on the allegation that he is an enemy combatant who bore arms against his country for the Taliban. His father claims to the contrary, that he is an inexperienced aid worker caught in the wrong place at the wrong time. This case brings into conflict the competing demands of national security and our citizens' constitutional right to personal liberty. Although I share the plurality's evident unease as it seeks to reconcile the two, I do not agree with its resolution.

Where the Government accuses a citizen of waging war against it, our constitutional tradition has been to prosecute him in federal court for treason or some other crime. Where the exigencies of war prevent that, the Constitution's Suspension Clause, Art. I, §9, cl. 2, allows Congress to relax the usual protections temporarily. Absent suspension, however, the Executive's assertion of military exigency has not been thought sufficient to permit detention without charge. No one contends that the congressional Authorization for Use of Military Force, on which the Government relies to justify its actions here, is an implementation of the Suspension Clause. Accordingly, I would reverse the judgment below.

I

The very core of liberty secured by our Anglo-Saxon system of separated powers has been freedom from indefinite

imprisonment at the will of the Executive. Blackstone stated this principle clearly:

> "Of great importance to the public is the preservation of this personal liberty: for if once it were left in the power of any, the highest, magistrate to imprison arbitrarily whomever he or his officers thought proper . . . there would soon be an end of all other rights and immunities. . . . To bereave a man of life, or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism, as must at once convey the alarm of tyranny throughout the whole kingdom. But confinement of the person, by secretly hurrying him to gaol, where his sufferings are unknown or forgotten; is a less public, a less striking, and therefore a more dangerous engine of arbitrary government. . . .
>
> "To make imprisonment lawful, it must either be, by process from the courts of judicature, or by warrant from some legal officer, having authority to commit to prison; which warrant must be in writing, under the hand and seal of the magistrate, and express the causes of the commitment, in order to be examined into (if necessary) upon a *habeas corpus*. If there be no cause expressed, the gaoler is not bound to detain the prisoner. For the law judges in this respect, . . . that it is unreasonable to send a prisoner, and not to signify withal the crimes alleged against him." 1 W. Blackstone, Commentaries on the Laws of England 131–133 (1765) (hereinafter Blackstone).

These words were well known to the Founders. Hamilton quoted from this very passage in The Federalist No. 84, p. 444 (G. Carey & J. McClellan eds. 2001). The two ideas central to Blackstone's understanding—due process as the right secured, and habeas corpus as the instrument by which due process could be insisted upon by a citizen illegally im-

prisoned—found expression in the Constitution's Due Process and Suspension Clauses. See Amdt. 5; Art. I, § 9, cl. 2.

The gist of the Due Process Clause, as understood at the founding and since, was to force the Government to follow those common-law procedures traditionally deemed necessary before depriving a person of life, liberty, or property. When a citizen was deprived of liberty because of alleged criminal conduct, those procedures typically required committal by a magistrate followed by indictment and trial. See, e. g., 2 & 3 Philip & Mary, ch. 10 (1555); 3 J. Story, Commentaries on the Constitution of the United States § 1783, p. 661 (1833) (hereinafter Story) (equating "due process of law" with "due presentment or indictment, and being brought in to answer thereto by due process of the common law"). The Due Process Clause "in effect affirms the right of trial according to the process and proceedings of the common law." *Ibid.* See also T. Cooley, General Principles of Constitutional Law 224 (1880) ("When life and liberty are in question, there must in every instance be judicial proceedings; and that requirement implies an accusation, a hearing before an impartial tribunal, with proper jurisdiction, and a conviction and judgment before the punishment can be inflicted" (internal quotation marks omitted)).

To be sure, certain types of permissible *non*criminal detention—that is, those not dependent upon the contention that the citizen had committed a criminal act—did not require the protections of criminal procedure. However, these fell into a limited number of well-recognized exceptions—civil commitment of the mentally ill, for example, and temporary detention in quarantine of the infectious. See *Opinion on the Writ of Habeas Corpus*, Wilm. 77, 88–92, 97 Eng. Rep. 29, 36–37 (H. L. 1758) (Wilmot, J.). It is unthinkable that the Executive could render otherwise criminal grounds for detention noncriminal merely by disclaiming an intent to prosecute, or by asserting that it was incapacitating dangerous offenders rather than punishing wrongdoing.

Cf. *Kansas* v. *Hendricks*, 521 U. S. 346, 358 (1997) ("A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment").

These due process rights have historically been vindicated by the writ of habeas corpus. In England before the founding, the writ developed into a tool for challenging executive confinement. It was not always effective. For example, in *Darnel's Case*, 3 How. St. Tr. 1 (K. B. 1627), King Charles I detained without charge several individuals for failing to assist England's war against France and Spain. The prisoners sought writs of habeas corpus, arguing that without specific charges, "imprisonment shall not continue on for a time, but for ever; and the subjects of this kingdom may be restrained of their liberties perpetually." *Id.*, at 8. The Attorney General replied that the Crown's interest in protecting the realm justified imprisonment in "a matter of state . . . not ripe nor timely" for the ordinary process of accusation and trial. *Id.*, at 37. The court denied relief, producing widespread outrage, and Parliament responded with the Petition of Right, accepted by the King in 1628, which expressly prohibited imprisonment without formal charges, see 3 Car. 1, ch. 1, §§ 5, 10.

The struggle between subject and Crown continued, and culminated in the Habeas Corpus Act of 1679, 31 Car. 2, ch. 2, described by Blackstone as a "second *magna carta*, and stable bulwark of our liberties." 1 Blackstone 133. The Act governed all persons "committed or detained . . . for any crime." § 3. In cases other than felony or treason plainly expressed in the warrant of commitment, the Act required release upon appropriate sureties (unless the commitment was for a nonbailable offense). *Ibid.* Where the commitment was for felony or high treason, the Act did not require immediate release, but instead required the Crown to commence criminal proceedings within a specified time. § 7. If the prisoner was not "indicted some Time in the next Term,"

the judge was "required . . . to set at Liberty the Prisoner upon Bail" unless the King was unable to produce his witnesses. *Ibid.* Able or no, if the prisoner was not brought to trial by the *next* succeeding term, the Act provided that "he shall be discharged from his Imprisonment." *Ibid.* English courts sat four terms per year, see 3 Blackstone 275–277, so the practical effect of this provision was that imprisonment without indictment or trial for felony or high treason under § 7 would not exceed approximately three to six months.

The writ of habeas corpus was preserved in the Constitution—the only common-law writ to be explicitly mentioned. See Art. I, § 9, cl. 2. Hamilton lauded "the establishment of the writ of *habeas corpus*" in his Federalist defense as a means to protect against "the practice of arbitrary imprisonments . . . in all ages, [one of] the favourite and most formidable instruments of tyranny." The Federalist No. 84, at 444. Indeed, availability of the writ under the new Constitution (along with the requirement of trial by jury in criminal cases, see Art. III, § 2, cl. 3) was his basis for arguing that additional, explicit procedural protections were unnecessary. See The Federalist No. 83, at 433.

## II

The allegations here, of course, are no ordinary accusations of criminal activity. Yaser Esam Hamdi has been imprisoned because the Government believes he participated in the waging of war against the United States. The relevant question, then, is whether there is a different, special procedure for imprisonment of a citizen accused of wrongdoing *by aiding the enemy in wartime.*

## A

JUSTICE O'CONNOR, writing for a plurality of this Court, asserts that captured enemy combatants (other than those suspected of war crimes) have traditionally been detained

until the cessation of hostilities and then released. *Ante,* at 518–519. That is probably an accurate description of wartime practice with respect to enemy *aliens.* The tradition with respect to American citizens, however, has been quite different. Citizens aiding the enemy have been treated as traitors subject to the criminal process.

As early as 1350, England's Statute of Treasons made it a crime to "levy War against our Lord the King in his Realm, or be adherent to the King's Enemies in his Realm, giving to them Aid and Comfort, in the Realm, or elsewhere." 25 Edw. 3, Stat. 5, c. 2. In his 1762 Discourse on High Treason, Sir Michael Foster explained:

> "With regard to Natural-born Subjects there can be no Doubt. They owe Allegiance to the Crown at all Times and in all Places.

> "The joining with Rebels in an Act of Rebellion, or with Enemies in Acts of Hostility, will make a Man a Traitor: in the one Case within the Clause of Levying War, in the other within that of Adhering to the King's enemies.

> "States in Actual Hostility with Us, though no War be solemnly Declared, are Enemies within the meaning of the Act. And therefore in an Indictment on the Clause of Adhering to the King's Enemies, it is sufficient to Aver that the Prince or State Adhered to *is an Enemy,* without shewing any War Proclaimed. . . . And if the Subject of a Foreign Prince in Amity with Us, invadeth the Kingdom without Commission from his Sovereign, He is an Enemy. And a Subject of *England* adhering to Him is a Traitor within this Clause of the Act." A Report of Some Proceedings on the Commission . . . for the Trial of the Rebels in the Year 1746 in the County of Surry, and of Other Crown Cases, Introduction, § 1, p. 183; Ch. 2, § 8, p. 216; § 12, p. 219.

Subjects accused of levying war against the King were routinely prosecuted for treason. *E. g., Harding's Case,* 2 Ventris 315, 86 Eng. Rep. 461 (K. B. 1690); *Trial of Parkyns,* 13 How. St. Tr. 63 (K. B. 1696); *Trial of Vaughan,* 13 How. St. Tr. 485 (K. B. 1696); *Trial of Downie,* 24 How. St. Tr. 1 (1794). The Founders inherited the understanding that a citizen's levying war against the Government was to be punished criminally. The Constitution provides: "Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort"; and establishes a heightened proof requirement (two witnesses) in order to "convic[t]" of that offense. Art. III, §3, cl. 1.

In more recent times, too, citizens have been charged and tried in Article III courts for acts of war against the United States, even when their noncitizen co-conspirators were not. For example, two American citizens alleged to have participated during World War I in a spying conspiracy on behalf of Germany were tried in federal court. See *United States* v. *Fricke,* 259 F. 673 (SDNY 1919); *United States* v. *Robinson,* 259 F. 685 (SDNY 1919). A German member of the same conspiracy was subjected to military process. See *United States ex rel. Wessels* v. *McDonald,* 265 F. 754 (EDNY 1920). During World War II, the famous German saboteurs of *Ex parte Quirin,* 317 U. S. 1 (1942), received military process, but the citizens who associated with them (with the exception of one citizen-saboteur, discussed below) were punished under the criminal process. See *Haupt* v. *United States,* 330 U. S. 631 (1947); L. Fisher, Nazi Saboteurs on Trial 80–84 (2003); see also *Cramer* v. *United States,* 325 U. S. 1 (1945).

The modern treason statute is 18 U. S. C. §2381; it basically tracks the language of the constitutional provision. Other provisions of Title 18 criminalize various acts of warmaking and adherence to the enemy. See, *e. g.,* §32 (destruction of aircraft or aircraft facilities), §2332a (use of

weapons of mass destruction), §2332b (acts of terrorism transcending national boundaries), §2339A (providing material support to terrorists), §2339B (providing material support to certain terrorist organizations), §2382 (misprision of treason), §2383 (rebellion or insurrection), §2384 (seditious conspiracy), §2390 (enlistment to serve in armed hostility against the United States). See also 31 CFR §595.204 (2003) (prohibiting the "making or receiving of any contribution of funds, goods, or services" to terrorists); 50 U.S.C. §1705(b) (criminalizing violations of 31 CFR §595.204). The only citizen other than Hamdi known to be imprisoned in connection with military hostilities in Afghanistan against the United States *was* subjected to criminal process and convicted upon a guilty plea. See *United States* v. *Lindh*, 212 F. Supp. 2d 541 (ED Va. 2002) (denying motions for dismissal); Seelye, N. Y. Times, Oct. 5, 2002, p. A1, col. 5.

## B

There are times when military exigency renders resort to the traditional criminal process impracticable. English law accommodated such exigencies by allowing legislative suspension of the writ of habeas corpus for brief periods. Blackstone explained:

> "And yet sometimes, when the state is in real danger, even this [*i. e.*, executive detention] may be a necessary measure. But the happiness of our constitution is, that it is not left to the executive power to determine when the danger of the state is so great, as to render this measure expedient. For the parliament only, or legislative power, whenever it sees proper, can authorize the crown, by suspending the *habeas corpus* act for a short and limited time, to imprison suspected persons without giving any reason for so doing. . . . In like manner this experiment ought only to be tried in cases of extreme emergency; and in these the nation parts with it[s] lib-

erty for a while, in order to preserve it for ever." 1 Blackstone 132.

Where the Executive has not pursued the usual course of charge, committal, and conviction, it has historically secured the Legislature's explicit approval of a suspension. In England, Parliament on numerous occasions passed temporary suspensions in times of threatened invasion or rebellion. *E. g.*, 1 W. & M., c. 7 (1688) (threatened return of James II); 7 & 8 Will. 3, c. 11 (1696) (same); 17 Geo. 2, c. 6 (1744) (threatened French invasion); 19 Geo. 2, c. 1 (1746) (threatened rebellion in Scotland); 17 Geo. 3, c. 9 (1777) (the American Revolution). Not long after Massachusetts had adopted a clause in its constitution explicitly providing for habeas corpus, see Mass. Const. pt. 2, ch. 6, art. VII (1780), reprinted in 3 Federal and State Constitutions, Colonial Charters and Other Organic Laws 1888, 1910 (F. Thorpe ed. 1909), it suspended the writ in order to deal with Shay's Rebellion, see Act for Suspending the Privilege of the Writ of Habeas Corpus, ch. 10, 1786 Mass. Acts p. 510.

Our Federal Constitution contains a provision explicitly permitting suspension, but limiting the situations in which it may be invoked: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Art. I, §9, cl. 2. Although this provision does not state that suspension must be effected by, or authorized by, a legislative act, it has been so understood, consistent with English practice and the Clause's placement in Article I. See *Ex parte Bollman*, 4 Cranch 75, 101 (1807); *Ex parte Merryman*, 17 F. Cas. 144, 151–152 (CD Md. 1861) (Taney, C. J., rejecting Lincoln's unauthorized suspension); 3 Story § 1336, at 208–209.

The Suspension Clause was by design a safety valve, the Constitution's only "express provision for exercise of extraordinary authority because of a crisis," *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 650 (1952) (Jack-

son, J., concurring). Very early in the Nation's history, President Jefferson unsuccessfully sought a suspension of habeas corpus to deal with Aaron Burr's conspiracy to overthrow the Government. See 16 Annals of Congress 402–425 (1807). During the Civil War, Congress passed its first Act authorizing executive suspension of the writ of habeas corpus, see Act of Mar. 3, 1863, 12 Stat. 755, to the relief of those many who thought President Lincoln's unauthorized proclamations of suspension (e. g., Proclamation No. 1, 13 Stat. 730) unconstitutional. Later Presidential proclamations of suspension relied upon the congressional authorization, e. g., Proclamation No. 7, 13 Stat. 734. During Reconstruction, Congress passed the Ku Klux Klan Act, which included a provision authorizing suspension of the writ, invoked by President Grant in quelling a rebellion in nine South Carolina counties. See Act of Apr. 20, 1871, ch. 22, § 4, 17 Stat. 14; A Proclamation [of Oct. 17, 1871], 7 Compilation of the Messages and Papers of the Presidents 136–138 (J. Richardson ed. 1899) (hereinafter Messages and Papers); id., at 138–139.

Two later Acts of Congress provided broad suspension authority to governors of U. S. possessions. The Philippine Civil Government Act of 1902 provided that the Governor of the Philippines could suspend the writ in case of rebellion, insurrection, or invasion. Act of July 1, 1902, ch. 1369, § 5, 32 Stat. 692. In 1905 the writ was suspended for nine months by proclamation of the Governor. See Fisher v. Baker, 203 U. S. 174, 179–181 (1906). The Hawaiian Organic Act of 1900 likewise provided that the Governor of Hawaii could suspend the writ in case of rebellion or invasion (or threat thereof). Ch. 339, § 67, 31 Stat. 153.

### III

Of course the extensive historical evidence of criminal convictions and habeas suspensions does not *necessarily* refute the Government's position in this case. When the writ is

suspended, the Government is entirely free from judicial oversight. It does not claim such total liberation here, but argues that it need only produce what it calls "some evidence" to satisfy a habeas court that a detained individual is an enemy combatant. See Brief for Respondents 34. Even if suspension of the writ on the one hand, and committal for criminal charges on the other hand, have been the only *traditional* means of dealing with citizens who levied war against their own country, it is theoretically possible that the Constitution does not *require* a choice between these alternatives.

I believe, however, that substantial evidence does refute that possibility. First, the text of the 1679 Habeas Corpus Act makes clear that indefinite imprisonment on reasonable suspicion is not an available option of treatment for those accused of aiding the enemy, absent a suspension of the writ. In the United States, this Act was read as "enforc[ing] the common law," *Ex parte Watkins*, 3 Pet. 193, 202 (1830), and shaped the early understanding of the scope of the writ. As noted above, see *supra*, at 557–558, § 7 of the Act specifically addressed those committed for high treason, and provided a remedy if they were not *indicted and tried* by the second succeeding court term. That remedy was *not* a bobtailed judicial inquiry into whether there were reasonable grounds to believe the prisoner had taken up arms against the King. Rather, if the prisoner was not indicted and tried within the prescribed time, "he shall be discharged from his Imprisonment." 31 Car. 2, c. 2, § 7. The Act does not contain any exception for wartime. That omission is conspicuous, since § 7 explicitly addresses the offense of "High Treason," which often involved offenses of a military nature. See cases cited *supra*, at 560.

Writings from the founding generation also suggest that, without exception, the only constitutional alternatives are to charge the crime or suspend the writ. In 1788, Thomas Jefferson wrote to James Madison questioning the need for a Suspension Clause in cases of rebellion in the proposed

Constitution. His letter illustrates the constraints under which the Founders understood themselves to operate:

> "Why suspend the Hab. corp. in insurrections and rebellions? The parties who may be arrested may be charged instantly with a well defined crime. Of course the judge will remand them. If the publick safety requires that the government should have a man imprisoned on less probable testimony in those than in other emergencies; let him be taken and tried, retaken and retried, while the necessity continues, only giving him redress against the government for damages." 13 Papers of Thomas Jefferson 442 (July 31, 1788) (J. Boyd ed. 1956).

A similar view was reflected in the 1807 House debates over suspension during the armed uprising that came to be known as Burr's conspiracy:

> "With regard to those persons who may be implicated in the conspiracy, if the writ of habeas corpus be not suspended, what will be the consequence? When apprehended, they will be brought before a court of justice, who will decide whether there is any evidence that will justify their commitment for farther prosecution. From the communication of the Executive, it appeared there was sufficient evidence to authorize their commitment. Several months would elapse before their final trial, which would give time to collect evidence, and if this shall be sufficient, they will not fail to receive the punishment merited by their crimes, and inflicted by the laws of their country." 16 Annals of Congress, at 405 (remarks of Rep. Burwell).

The absence of military authority to imprison citizens indefinitely in wartime—whether or not a probability of treason had been established by means less than jury trial—was confirmed by three cases decided during and immediately after the War of 1812. In the first, *In re Stacy*, 10 Johns.

*328 (N. Y. 1813), a citizen was taken into military custody on suspicion that he was "carrying provisions and giving information to the enemy." *Id.*, at *330 (emphasis deleted). Stacy petitioned for a writ of habeas corpus, and, after the defendant custodian attempted to avoid complying, Chief Justice Kent ordered attachment against him. Kent noted that the military was "without any color of authority in any military tribunal to try a citizen for that crime" and that it was "holding him in the closest confinement, and contemning the civil authority of the state." *Id.*, at *333–*334.

Two other cases, later cited with approval by this Court in *Ex parte Milligan*, 4 Wall. 2, 128–129 (1866), upheld verdicts for false imprisonment against military officers. In *Smith* v. *Shaw*, 12 Johns. *257 (N. Y. 1815), the court affirmed an award of damages for detention of a citizen on suspicion that he was, among other things, "an enemy's spy in time of war." *Id.*, at *265. The court held that "[n]one of the offences charged against *Shaw* were cognizable by a court-martial, except that which related to his being a spy; and if he was an *American* citizen, he could not be charged with such an offence. He might be amenable to the civil authority for treason; but could not be punished, under martial law, as a spy." *Ibid.* "If the defendant was justifiable in doing what he did, every citizen of the *United States* would, in time of war, be equally exposed to a like exercise of military power and authority." *Id.*, at *266. Finally, in *M'Connell* v. *Hampton*, 12 Johns. *234 (N. Y. 1815), a jury awarded $9,000 for false imprisonment after a military officer confined a citizen on charges of treason; the judges on appeal did not question the verdict but found the damages excessive, in part because "it does not appear that [the defendant] . . . knew [the plaintiff] was a citizen." *Id.*, at *238 (Spencer, J.). See generally Wuerth, The President's Power to Detain "Enemy Combatants": Modern Lessons from Mr. Madison's Forgotten War, 98 Nw. U. L. Rev. 1567 (2004).

President Lincoln, when he purported to suspend habeas corpus without congressional authorization during the Civil War, apparently did not doubt that suspension was required if the prisoner was to be held without criminal trial. In his famous message to Congress on July 4, 1861, he argued only that he could suspend the writ, not that even without suspension, his imprisonment of citizens without criminal trial was permitted. See Special Session Message, 6 Messages and Papers 20–31.

Further evidence comes from this Court's decision in *Ex parte Milligan, supra.* There, the Court issued the writ to an American citizen who had been tried by military commission for offenses that included conspiring to overthrow the Government, seize munitions, and liberate prisoners of war. *Id.,* at 6–7. The Court rejected in no uncertain terms the Government's assertion that military jurisdiction was proper "under the 'laws and usages of war,'" *id.,* at 121:

> "It can serve no useful purpose to inquire what those laws and usages are, whence they originated, where found, and on whom they operate; they can never be applied to citizens in states which have upheld the authority of the government, and where the courts are open and their process unobstructed," *ibid.*[1]

*Milligan* is not exactly this case, of course, since the petitioner was threatened with death, not merely imprisonment. But the reasoning and conclusion of *Milligan* logically cover the present case. The Government justifies imprisonment of Hamdi on principles of the law of war and admits that, absent the war, it would have no such authority. But if the

---

[1] As I shall discuss presently, see *infra,* at 570–572, the Court purported to limit this language in *Ex parte Quirin,* 317 U. S. 1, 45 (1942). Whatever *Quirin*'s effect on *Milligan*'s precedential value, however, it cannot undermine its value as an indicator of original meaning. Cf. *Reid* v. *Covert,* 354 U. S. 1, 30 (1957) (plurality opinion) (*Milligan* remains "one of the great landmarks in this Court's history").

law of war cannot be applied to citizens where courts are open, then Hamdi's imprisonment without criminal trial is no less unlawful than Milligan's trial by military tribunal.

*Milligan* responded to the argument, repeated by the Government in this case, that it is dangerous to leave suspected traitors at large in time of war:

> "If it was dangerous, in the distracted condition of affairs, to leave Milligan unrestrained of his liberty, because he 'conspired against the government, afforded aid and comfort to rebels, and incited the people to insurrection,' the *law* said arrest him, confine him closely, render him powerless to do further mischief; and then present his case to the grand jury of the district, with proofs of his guilt, and, if indicted, try him according to the course of the common law. If this had been done, the Constitution would have been vindicated, the law of 1863 enforced, and the securities for personal liberty preserved and defended." *Id.*, at 122.

Thus, criminal process was viewed as the primary means— and the only means absent congressional action suspending the writ—not only to punish traitors, but to incapacitate them.

The proposition that the Executive lacks indefinite wartime detention authority over citizens is consistent with the Founders' general mistrust of military power permanently at the Executive's disposal. In the Founders' view, the "blessings of liberty" were threatened by "those military establishments which must gradually poison its very fountain." The Federalist No. 45, p. 238 (J. Madison). No fewer than 10 issues of the Federalist were devoted in whole or part to allaying fears of oppression from the proposed Constitution's authorization of standing armies in peacetime. Many safeguards in the Constitution reflect these concerns. Congress's authority "[t]o raise and support Armies" was hedged with the proviso that "no Appropriation of Money to that

Use shall be for a longer Term than two Years." U. S. Const., Art. I, § 8, cl. 12. Except for the actual command of military forces, all authorization for their maintenance and all explicit authorization for their use is placed in the control of Congress under Article I, rather than the President under Article II. As Hamilton explained, the President's military authority would be "much inferior" to that of the British King:

> "It would amount to nothing more than the supreme command and direction of the military and naval forces, as first general and admiral of the confederacy: while that of the British king extends to the *declaring* of war, and to the *raising* and *regulating* of fleets and armies; all which, by the constitution under consideration, would appertain to the legislature." The Federalist No. 69, p. 357.

A view of the Constitution that gives the Executive authority to use military force rather than the force of law against citizens on American soil flies in the face of the mistrust that engendered these provisions.

## IV

The Government argues that our more recent jurisprudence ratifies its indefinite imprisonment of a citizen within the territorial jurisdiction of federal courts. It places primary reliance upon *Ex parte Quirin,* 317 U. S. 1 (1942), a World War II case upholding the trial by military commission of eight German saboteurs, one of whom, Herbert Haupt, was a U. S. citizen. The case was not this Court's finest hour. The Court upheld the commission and denied relief in a brief *per curiam* issued the day after oral argument concluded, see *id.,* at 18–19, unnumbered note; a week later the Government carried out the commission's death sentence upon six saboteurs, including Haupt. The Court eventually explained its reasoning in a written opinion issued several months later.

Only three paragraphs of the Court's lengthy opinion dealt with the particular circumstances of Haupt's case. See *id.*, at 37–38, 45–46. The Government argued that Haupt, like the other petitioners, could be tried by military commission under the laws of war. In agreeing with that contention, *Quirin* purported to interpret the language of *Milligan* quoted above (the law of war "can never be applied to citizens in states which have upheld the authority of the government, and where the courts are open and their process unobstructed") in the following manner:

> "Elsewhere in its opinion . . . the Court was at pains to point out that Milligan, a citizen twenty years resident in Indiana, who had never been a resident of any of the states in rebellion, was not an enemy belligerent either entitled to the status of a prisoner of war or subject to the penalties imposed upon unlawful belligerents. We construe the Court's statement as to the inapplicability of the law of war to Milligan's case as having particular reference to the facts before it. From them the Court concluded that Milligan, not being a part of or associated with the armed forces of the enemy, was a nonbelligerent, not subject to the law of war . . . ." 317 U. S., at 45.

In my view this seeks to revise *Milligan* rather than describe it. *Milligan* had involved (among other issues) two separate questions: (1) whether the military trial of Milligan was justified by the laws of war, and if not (2) whether the President's suspension of the writ, pursuant to congressional authorization, prevented the issuance of habeas corpus. The Court's categorical language about the law of war's inapplicability to citizens where the courts are open (with no exception mentioned for citizens who were prisoners of war) was contained in its discussion of the first point. See 4 Wall., at 121. The factors pertaining to whether Milligan could reasonably be considered a belligerent and prisoner of war,

while mentioned earlier in the opinion, see *id.*, at 118, were made relevant and brought to bear in the Court's later discussion, see *id.*, at 131, of whether Milligan came within the statutory provision that effectively made an exception to Congress's authorized suspension of the writ for (as the Court described it) "all parties, not prisoners of war, resident in their respective jurisdictions, . . . who were citizens of states in which the administration of the laws in the Federal tribunals was unimpaired," *id.*, at 116. *Milligan* thus understood was in accord with the traditional law of habeas corpus I have described: Though treason often occurred in wartime, there was, absent provision for special treatment in a congressional suspension of the writ, no exception to the right to trial by jury for citizens who could be called "belligerents" or "prisoners of war."[2]

But even if *Quirin* gave a correct description of *Milligan*, or made an irrevocable revision of it, *Quirin* would still not justify denial of the writ here. In *Quirin* it was uncontested that the petitioners were members of enemy forces. They were *"admitted* enemy invaders," 317 U. S., at 47 (emphasis added), and it was "undisputed" that they had landed in the United States in service of German forces, *id.*, at 20. The specific holding of the Court was only that, "upon the *conceded* facts," the petitioners were "plainly within [the] boundaries" of military jurisdiction, *id.*, at 46 (emphasis added).[3] But where those jurisdictional facts are *not* con-

---

[2] Without bothering to respond to this analysis, the plurality states that *Milligan* "turned in large part" upon the defendant's lack of prisoner-of-war status, and that the *Milligan* Court explicitly and repeatedly *said* so. *Ante*, at 522. Neither is true. To the extent, however, that prisoner-of-war status was relevant in *Milligan*, it was only because prisoners of war *received different statutory treatment* under the conditional suspension then in effect.

[3] The only two Court of Appeals cases from World War II cited by the Government in which citizens were detained without trial likewise involved petitioners who were conceded to have been members of enemy forces. See *In re Territo*, 156 F. 2d 142, 143–145 (CA9 1946); *Colepaugh*

ceded—where the petitioner insists that he is *not* a belligerent—*Quirin* left the pre-existing law in place: Absent suspension of the writ, a citizen held where the courts are open is entitled either to criminal trial or to a judicial decree requiring his release.[4]

---

v. *Looney*, 235 F. 2d 429, 432 (CA10 1956). The plurality complains that *Territo* is the only case I have identified in which "a United States citizen [was] captured in a *foreign* combat zone," *ante*, at 523. Indeed it is; such cases must surely be rare. But given the constitutional tradition I have described, the burden is not upon me to find cases in which the writ was *granted* to citizens in this country *who had been captured on foreign battlefields;* it is upon those who would carve out an exception for such citizens (as the plurality's complaint suggests it would) to find a single case (other than one where enemy status was admitted) in which habeas was *denied.*

[4] The plurality's assertion that *Quirin* somehow "clarifies" *Milligan*, *ante*, at 523, is simply false. As I discuss *supra*, at 570–571 and this page, the *Quirin* Court propounded a mistaken understanding of *Milligan;* but nonetheless its holding was limited to "the case presented by the present record," and to *"the conceded facts,"* and thus avoided conflict with the earlier case. See 317 U. S., at 45–46 (emphasis added). The plurality, ignoring this expressed limitation, thinks it "beside the point" whether belligerency is conceded or found "by some other process" (not necessarily a jury trial) "that verifies this fact with sufficient certainty." *Ante*, at 523. But the whole point of the procedural guarantees in the Bill of Rights is to limit the methods by which the Government can determine facts that the citizen disputes and on which the citizen's liberty depends. The plurality's claim that *Quirin's* one-paragraph discussion of *Milligan* provides a "[c]lear . . . disavowal" of two false imprisonment cases from the War of 1812, *ante*, at 522, thus defies logic; unlike the plaintiffs in those cases, Haupt was concededly a member of an enemy force.

The Government also cites *Moyer* v. *Peabody*, 212 U. S. 78 (1909), a suit for damages against the Governor of Colorado, for violation of due process in detaining the alleged ringleader of a rebellion quelled by the state militia after the Governor's declaration of a state of insurrection and (he contended) suspension of the writ "as incident thereto." *Ex parte Moyer*, 35 Colo. 154, 157, 91 P. 738, 740 (1905). But the holding of *Moyer* v. *Peabody* (even assuming it is transferable from state-militia detention after state suspension to federal standing-army detention without suspension) is simply that "[s]o long as such arrests [were] made in good faith and in the honest belief that they [were] needed in order to head the insurrection

## V

It follows from what I have said that Hamdi is entitled to a habeas decree requiring his release unless (1) criminal proceedings are promptly brought, or (2) Congress has suspended the writ of habeas corpus. A suspension of the writ could, of course, lay down conditions for continued detention, similar to those that today's opinion prescribes under the Due Process Clause. Cf. Act of Mar. 3, 1863, 12 Stat. 755. But there is a world of difference between the people's representatives' determining the need for that suspension (and prescribing the conditions for it), and this Court's doing so.

The plurality finds justification for Hamdi's imprisonment in the Authorization for Use of Military Force, 115 Stat. 224, which provides:

> "That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." § 2(a).

---

off," 212 U. S., at 85, an action in damages could not lie. This "good-faith" analysis is a forebear of our modern doctrine of qualified immunity. Cf. *Scheuer* v. *Rhodes*, 416 U. S. 232, 247–248 (1974) (understanding *Moyer* in this way). Moreover, the detention at issue in *Moyer* lasted about 2½ months, see 212 U. S., at 85, roughly the length of time permissible under the 1679 Habeas Corpus Act, see *supra*, at 557–558.

In addition to *Moyer* v. *Peabody*, JUSTICE THOMAS relies upon *Luther* v. *Borden*, 7 How. 1 (1849), a case in which the state legislature had imposed martial law—a step even more drastic than suspension of the writ. See *post*, at 590–591 (dissenting opinion). But martial law has not been imposed here, and in any case is limited to "the theatre of active military operations, where war really prevails," and where therefore the courts are closed. *Ex parte Milligan*, 4 Wall. 2, 127 (1866); see also *id.*, at 129–130 (distinguishing *Luther*).

This is not remotely a congressional suspension of the writ, and no one claims that it is. Contrary to the plurality's view, I do not think this statute even authorizes detention of a citizen with the clarity necessary to satisfy the interpretive canon that statutes should be construed so as to avoid grave constitutional concerns, see *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council,* 485 U. S. 568, 575 (1988); with the clarity necessary to comport with cases such as *Ex parte Endo,* 323 U. S. 283, 300 (1944), and *Duncan* v. *Kahanamoku,* 327 U. S. 304, 314–316, 324 (1946); or with the clarity necessary to overcome the statutory prescription that "[n]o citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress" 18 U. S. C. § 4001(a).[5] But even if it

---

[5] The plurality rejects any need for "specific language of detention" on the ground that detention of alleged combatants is a "fundamental incident of waging war." *Ante,* at 519. Its authorities do not support that holding in the context of the present case. Some are irrelevant because they do not address the detention of *American citizens.* *E. g.,* Naqvi, Doubtful Prisoner-of-War Status, 84 Int'l Rev. Red Cross 571, 572 (2002). The plurality's assertion that detentions of citizen and alien combatants are equally authorized has no basis in law or common sense. Citizens and noncitizens, even if equally dangerous, are not similarly situated. See, *e. g., Milligan, supra; Johnson* v. *Eisentrager,* 339 U. S. 763 (1950); Rev. Stat. 4067, 50 U. S. C. § 21 (Alien Enemy Act). That captivity may be consistent with the principles of international law does not prove that it also complies with the restrictions that the Constitution places on the American Government's treatment of its own citizens. Of the authorities cited by the plurality that do deal with detention of citizens, *Quirin, supra,* and *Territo,* 156 F. 2d 142, have already been discussed and rejected. See *supra,* at 571–572, and n. 3. The remaining authorities pertain to U. S. detention of citizens during the Civil War, and are irrelevant for two reasons: (1) the Lieber Code was issued following a congressional authorization of suspension of the writ, see Instructions for the Government of Armies of the United States in the Field, Gen. Order No. 100 (1863), reprinted in 2 F. Lieber, Miscellaneous Writings, p. 246; Act of Mar. 3, 1863, 12 Stat. 755, §§ 1, 2; and (2) citizens of the Confederacy, while citizens of the United States, were also regarded as citizens of a hostile power.

did, I would not permit it to overcome Hamdi's entitlement to habeas corpus relief. The Suspension Clause of the Constitution, which carefully circumscribes the conditions under which the writ can be withheld, would be a sham if it could be evaded by congressional prescription of requirements *other than the common-law requirement of committal for criminal prosecution* that render the writ, though available, unavailing. If the Suspension Clause does not guarantee the citizen that he will either be tried or released, unless the conditions for suspending the writ exist and the grave action of suspending the writ has been taken; if it merely guarantees the citizen that he will not be detained unless Congress by ordinary legislation says he can be detained; it guarantees him very little indeed.

It should not be thought, however, that the plurality's evisceration of the Suspension Clause augments, principally, the power of Congress. As usual, the major effect of its constitutional improvisation is to increase the power of the Court. Having found a congressional authorization for detention of citizens where none clearly exists; and having discarded the categorical procedural protection of the Suspension Clause; the plurality then proceeds, under the guise of the Due Process Clause, to prescribe what procedural protections *it* thinks appropriate. It "weigh[s] the private interest . . . against the Government's asserted interest," *ante,* at 529 (internal quotation marks omitted), and—just as though writing a new Constitution—comes up with an unheard-of system in which the citizen rather than the Government bears the burden of proof, testimony is by hearsay rather than live witnesses, and the presiding officer may well be a "neutral" military officer rather than judge and jury. See *ante,* at 533–534. It claims authority to engage in this sort of "judicious balancing" from *Mathews* v. *Eldridge,* 424 U. S. 319 (1976), a case involving . . . *the withdrawal of disability benefits!* Whatever the merits of this technique when newly

recognized property rights are at issue (and even there they are questionable), it has no place where the Constitution and the common law already supply an answer.

Having distorted the Suspension Clause, the plurality finishes up by transmogrifying the Great Writ—disposing of the present habeas petition by remanding for the District Court to "engag[e] in a factfinding process that is both prudent and incremental," *ante*, at 539. "In the absence of [the Executive's prior provision of procedures that satisfy due process], . . . a court that receives a petition for a writ of habeas corpus from an alleged enemy combatant must itself ensure that the minimum requirements of due process are achieved." *Ante*, at 538. This judicial remediation of executive default is unheard of. The role of habeas corpus is to determine the legality of executive detention, not to supply the omitted process necessary to make it legal. See *Preiser* v. *Rodriguez*, 411 U. S. 475, 484 (1973) ("[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody"); 1 Blackstone 132–133. It is not the habeas court's function to make illegal detention legal by supplying a process that the Government could have provided, but chose not to. If Hamdi is being imprisoned in violation of the Constitution (because without due process of law), then his habeas petition should be granted; the Executive may then hand him over to the criminal authorities, whose detention for the purpose of prosecution will be lawful, or else must release him.

There is a certain harmony of approach in the plurality's making up for Congress's failure to invoke the Suspension Clause and its making up for the Executive's failure to apply what it says are needed procedures—an approach that reflects what might be called a Mr. Fix-it Mentality. The plurality seems to view it as its mission to Make Everything Come Out Right, rather than merely to decree the consequences, as far as individual rights are concerned, of the

other two branches' actions and omissions. Has the Legislature failed to suspend the writ in the current dire emergency? Well, we will remedy that failure by prescribing the reasonable conditions that a suspension should have included. And has the Executive failed to live up to those reasonable conditions? Well, we will ourselves make that failure good, so that this dangerous fellow (if he is dangerous) need not be set free. The problem with this approach is not only that it steps out of the courts' modest and limited role in a democratic society; but that by repeatedly doing what it thinks the political branches ought to do it encourages their lassitude and saps the vitality of government by the people.

## VI

Several limitations give my views in this matter a relatively narrow compass. They apply only to citizens, accused of being enemy combatants, who are detained within the territorial jurisdiction of a federal court. This is not likely to be a numerous group; currently we know of only two, Hamdi and Jose Padilla. Where the citizen is captured outside and held outside the United States, the constitutional requirements may be different. Cf. *Johnson* v. *Eisentrager,* 339 U. S. 763, 769–771 (1950); *Reid* v. *Covert,* 354 U. S. 1, 74–75 (1957) (Harlan, J., concurring in result); *Rasul* v. *Bush, ante,* at 502–504 (SCALIA, J., dissenting). Moreover, even within the United States, the accused citizen-enemy combatant may lawfully be detained once prosecution is in progress or in contemplation. See, *e. g., County of Riverside* v. *McLaughlin,* 500 U. S. 44 (1991) (brief detention pending judicial determination after warrantless arrest); *United States* v. *Salerno,* 481 U. S. 739 (1987) (pretrial detention under the Bail Reform Act). The Government has been notably successful in securing conviction, and hence long-term custody or execution, of those who have waged war against the state.

I frankly do not know whether these tools are sufficient to meet the Government's security needs, including the need to obtain intelligence through interrogation. It is far beyond

my competence, or the Court's competence, to determine that. But it is not beyond Congress's. If the situation demands it, the Executive can ask Congress to authorize suspension of the writ—which can be made subject to whatever conditions Congress deems appropriate, including even the procedural novelties invented by the plurality today. To be sure, suspension is limited by the Constitution to cases of rebellion or invasion. But whether the attacks of September 11, 2001, constitute an "invasion," and whether those attacks still justify suspension several years later, are questions for Congress rather than this Court. See 3 Story § 1336, at 208–209.[6] If civil rights are to be curtailed during wartime, it must be done openly and democratically, as the Constitution requires, rather than by silent erosion through an opinion of this Court.

\*     \*     \*

The Founders well understood the difficult tradeoff between safety and freedom. "Safety from external danger," Hamilton declared,

> "is the most powerful director of national conduct. Even the ardent love of liberty will, after a time, give way to its dictates. The violent destruction of life and property incident to war; the continual effort and alarm attendant on a state of continual danger, will compel nations the most attached to liberty, to resort for repose and security to institutions which have a tendency to destroy their civil and political rights. To be more safe, they, at length, become willing to run the risk of being less free." The Federalist No. 8, p. 33.

---

[6] JUSTICE THOMAS worries that the constitutional conditions for suspension of the writ will not exist "during many . . . emergencies during which . . . detention authority might be necessary," *post,* at 594. It is difficult to imagine situations in which security is so seriously threatened as to justify indefinite imprisonment without trial, and yet the constitutional conditions of rebellion or invasion are not met.

The Founders warned us about the risk, and equipped us with a Constitution designed to deal with it.

Many think it not only inevitable but entirely proper that liberty give way to security in times of national crisis—that, at the extremes of military exigency, *inter arma silent leges.* Whatever the general merits of the view that war silences law or modulates its voice, that view has no place in the interpretation and application of a Constitution designed precisely to confront war and, in a manner that accords with democratic principles, to accommodate it. Because the Court has proceeded to meet the current emergency in a manner the Constitution does not envision, I respectfully dissent.

JUSTICE THOMAS, dissenting.

The Executive Branch, acting pursuant to the powers vested in the President by the Constitution and with explicit congressional approval, has determined that Yaser Hamdi is an enemy combatant and should be detained. This detention falls squarely within the Federal Government's war powers, and we lack the expertise and capacity to second-guess that decision. As such, petitioners' habeas challenge should fail, and there is no reason to remand the case. The plurality reaches a contrary conclusion by failing adequately to consider basic principles of the constitutional structure as it relates to national security and foreign affairs and by using the balancing scheme of *Mathews* v. *Eldridge,* 424 U. S. 319 (1976). I do not think that the Federal Government's war powers can be balanced away by this Court. Arguably, Congress could provide for additional procedural protections, but until it does, we have no right to insist upon them. But even if I were to agree with the general approach the plurality takes, I could not accept the particulars. The plurality utterly fails to account for the Government's compelling interests and for our own institutional inability to weigh competing concerns correctly. I respectfully dissent.

I

"It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig* v. *Agee*, 453 U. S. 280, 307 (1981) (quoting *Aptheker* v. *Secretary of State*, 378 U. S. 500, 509 (1964)). The national security, after all, is the primary responsibility and purpose of the Federal Government. See, *e. g., Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 662 (1952) (Clark, J., concurring in judgment); The Federalist No. 23, pp. 146–147 (J. Cooke ed. 1961) (A. Hamilton) ("The principle purposes to be answered by Union are these—The common defence of the members—the preservation of the public peace as well against internal convulsions as external attacks"). But because the Founders understood that they could not foresee the myriad potential threats to national security that might later arise, they chose to create a Federal Government that necessarily possesses sufficient power to handle any threat to the security of the Nation. The power to protect the Nation

> "ought to exist without limitation . . . *[b]ecause it is impossible to foresee or define the extent and variety of national exigencies, or the correspondent extent & variety of the means which may be necessary to satisfy them.* The circumstances that endanger the safety of nations are infinite; and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed." *Id.*, at 147.

See also *id.*, Nos. 34 and 41.

The Founders intended that the President have primary responsibility—along with the necessary power—to protect the national security and to conduct the Nation's foreign relations. They did so principally because the structural advantages of a unitary Executive are essential in these domains. "Energy in the executive is a leading character in the definition of good government. It is essential to the protection of the community against foreign attacks." *Id.*,

No. 70, at 471 (A. Hamilton). The principle "ingredien[t]" for "energy in the executive" is "unity." *Id.*, at 472. This is because "[d]ecision, activity, secrecy, and dispatch will generally characterise the proceedings of one man, in a much more eminent degree, than the proceedings of any greater number." *Ibid.*

These structural advantages are most important in the national-security and foreign-affairs contexts. "Of all the cares or concerns of government, the direction of war most peculiarly demands those qualities which distinguish the exercise of power by a single hand." *Id.*, No. 74, at 500 (A. Hamilton). Also for these reasons, John Marshall explained that "[t]he President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." 10 Annals of Cong. 613 (1800); see *id.*, at 613–614. To this end, the Constitution vests in the President "[t]he executive Power," Art. II, §1, provides that he "shall be Commander in Chief of the" Armed Forces, §2, and places in him the power to recognize foreign governments, §3.

This Court has long recognized these features and has accordingly held that the President has *constitutional* authority to protect the national security and that this authority carries with it broad discretion.

> "If a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force. He does not initiate the war, but is bound to accept the challenge without waiting for any special legislative authority. . . . Whether the President in fulfilling his duties, as Commander in-chief, in suppressing an insurrection, has met with such armed hostile resistance . . . is a question to be decided *by him*." *Prize Cases*, 2 Black 635, 668, 670 (1863).

The Court has acknowledged that the President has the authority to "employ [the Nation's Armed Forces] in the manner he may deem most effectual to harass and conquer and

subdue the enemy." *Fleming* v. *Page*, 9 How. 603, 615 (1850). With respect to foreign affairs as well, the Court has recognized the President's independent authority and need to be free from interference. See, *e. g., United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 320 (1936) (explaining that the President "has his confidential sources of information. He has his agents in the form of diplomatic, consular and other officials. Secrecy in respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results"); *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 111 (1948).

Congress, to be sure, has a substantial and essential role in both foreign affairs and national security. But it is crucial to recognize that *judicial* interference in these domains destroys the purpose of vesting primary responsibility in a unitary Executive. I cannot improve on Justice Jackson's words, speaking for the Court:

> "The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret. Nor can courts sit *in camera* in order to be taken into executive confidences. But even if courts could require full disclosure, the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility

and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Ibid.*

Several points, made forcefully by Justice Jackson, are worth emphasizing. First, with respect to certain decisions relating to national security and foreign affairs, the courts simply lack the relevant information and expertise to second-guess determinations made by the President based on information properly withheld. Second, even if the courts could compel the Executive to produce the necessary information, such decisions are simply not amenable to judicial determination because "[t]hey are delicate, complex, and involve large elements of prophecy." *Ibid.* Third, the Court in *Chicago & Southern Air Lines* and elsewhere has correctly recognized the primacy of the political branches in the foreign-affairs and national-security contexts.

For these institutional reasons and because "Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act," it should come as no surprise that "[s]uch failure of Congress . . . does not, 'especially . . . in the areas of foreign policy and national security,' imply 'congressional disapproval' of action taken by the Executive." *Dames & Moore v. Regan,* 453 U. S. 654, 678 (1981) (quoting *Agee,* 453 U. S., at 291). Rather, in these domains, the fact that Congress has provided the President with broad authorities does not imply—and the Judicial Branch should not infer—that Congress intended to deprive him of particular powers not specifically enumerated. See *Dames & Moore,* 453 U. S., at 678. As far as the courts are concerned, "the enactment of legislation closely related to the question of the President's authority in a particular case which evinces legislative intent to accord the President broad discretion may be considered to 'invite' 'measures on independent presidential responsibility.'" *Ibid.* (quoting *Youngstown,* 343 U. S., at 637 (Jackson, J., concurring)).

Finally, and again for the same reasons, where "the President acts pursuant to an express or implied authorization from Congress, he exercises not only his powers but also those delegated by Congress[, and i]n such a case the executive action 'would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'" *Dames & Moore, supra,* at 668 (quoting *Youngstown, supra,* at 637 (Jackson, J., concurring)). That is why the Court has explained, in a case analogous to this one, that "the detention[,] ordered by the President in the declared exercise of his powers as Commander in Chief of the Army in time of war and of grave public danger[, is] not to be set aside by the courts without the clear conviction that [it is] in conflict with the Constitution or laws of Congress constitutionally enacted." *Ex parte Quirin,* 317 U. S. 1, 25 (1942). See also *Ex parte Milligan,* 4 Wall. 2, 133 (1866) (Chase, C. J., concurring in judgment) (stating that a sentence imposed by a military commission "must not be set aside except upon the clearest conviction that it cannot be reconciled with the Constitution and the constitutional legislation of Congress"). This deference extends to the President's determination of all the factual predicates necessary to conclude that a given action is appropriate. See *Quirin, supra,* at 25 ("We are not here concerned with any question of the guilt or innocence of petitioners"). See also *Hirabayashi* v. *United States,* 320 U. S. 81, 93 (1943); *Prize Cases,* 2 Black, at 670; *Martin* v. *Mott,* 12 Wheat. 19, 29–30 (1827).

To be sure, the Court has at times held, in specific circumstances, that the military acted beyond its warmaking authority. But these cases are distinguishable in important ways. In *Ex parte Endo,* 323 U. S. 283 (1944), the Court held unlawful the detention of an admittedly law-abiding and loyal American of Japanese ancestry. It did so because the

Government's asserted reason for the detention had nothing to do with the congressional and executive authorities upon which the Government relied. Those authorities permitted detention for the purpose of preventing espionage and sabotage and thus could not be pressed into service for detaining a loyal citizen. See *id.*, at 301–302. Further, the Court "stress[ed] the silence . . . of the [relevant] Act *and the Executive Orders.*" *Id.*, at 301 (emphasis added); see also *id.*, at 301–304. The Court sensibly held that the Government could not detain a loyal citizen pursuant to executive and congressional authorities that could not conceivably be implicated given the Government's factual allegations. And in *Youngstown*, Justice Jackson emphasized that "Congress ha[d] not left seizure of private property an open field but ha[d] covered it by three statutory policies inconsistent with th[e] seizure." 343 U. S., at 639 (concurring opinion). See also *Milligan, supra,* at 134 (Chase, C. J., concurring in judgment) (noting that the Government failed to comply with statute directly on point).

I acknowledge that the question whether Hamdi's executive detention is lawful is a question properly resolved by the Judicial Branch, though the question comes to the Court with the strongest presumptions in favor of the Government. The plurality agrees that Hamdi's detention is lawful if he is an enemy combatant. But the question whether Hamdi is actually an enemy combatant is "of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Chicago & Southern Air Lines,* 333 U. S., at 111. That is, although it is appropriate for the Court to determine the judicial question whether the President has the asserted authority, see, *e. g., Ex parte Endo, supra,* we lack the information and expertise to question whether Hamdi is actually an enemy combatant, a question the resolution of which is

committed to other branches.[1]   In the words of then-Judge Scalia:

> "In Old Testament days, when judges ruled the people of Israel and led them into battle, a court professing the belief that it could order a halt to a military operation in foreign lands might not have been a startling phenomenon.   But in modern times, and in a country where such governmental functions have been committed to elected delegates of the people, such an assertion of jurisdiction is extraordinary.   The [C]ourt's decision today reflects a willingness to extend judicial power into areas where we do not know, and have no way of finding out, what serious harm we may be doing." *Ramirez de Arellano* v. *Weinberger,* 745 F. 2d 1500, 1550–1551 (CADC 1984) (dissenting opinion) (footnote omitted).

See also *id.,* at 1551, n. 1 (noting that "[e]ven the ancient Israelites eventually realized the shortcomings of judicial commanders-in-chief").   The decision whether someone is an enemy combatant is, no doubt, "delicate, complex, and involv[es] large elements of prophecy," *Chicago & Southern Air Lines, supra,* at 111, which, incidentally might in part explain why "the Government has never provided any court with the full criteria that it uses in classifying individuals as such," *ante,* at 516.   See also *infra,* at 597–598 (discussing other military decisions).

## II

" 'The war power of the national government is "the power to wage war successfully." ' " *Lichter* v. *United States,* 334

---

[1] Although I have emphasized national-security concerns, the President's foreign-affairs responsibilities are also squarely implicated by this case. The Government avers that Northern Alliance forces captured Hamdi, and the District Court demanded that the Government turn over information relating to statements made by members of the Northern Alliance.   See 316 F. 3d 450, 462 (CA4 2003).

U. S. 742, 767, n. 9 (1948) (quoting Hughes, War Powers Under the Constitution, 42 A. B. A. Rep. 232, 238 (1917)). It follows that this power "is not limited to victories in the field, but carries with it the inherent power to guard against the immediate renewal of the conflict," *In re Yamashita,* 327 U. S. 1, 12 (1946); see also *Stewart* v. *Kahn,* 11 Wall. 493, 507 (1871), and quite obviously includes the ability to detain those (even United States citizens) who fight against our troops or those of our allies, see, *e. g., Quirin,* 317 U. S., at 28–29, 30–31; *id.,* at 37–39; *Duncan* v. *Kahanamoku,* 327 U. S. 304, 313–314 (1946); W. Winthrop, Military Law and Precedents 788 (rev. 2d ed. 1920); W. Whiting, War Powers Under the Constitution of the United States 167 (43d ed. 1871); *id.,* at 44–46 (noting that Civil War "rebels" may be treated as foreign belligerents); see also *ante,* at 518–519.

Although the President very well may have inherent authority to detain those arrayed against our troops, I agree with the plurality that we need not decide that question because Congress has authorized the President to do so. See *ante,* at 517. The Authorization for Use of Military Force (AUMF), 115 Stat. 224, authorizes the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" of September 11, 2001. Indeed, the Court has previously concluded that language materially identical to the AUMF authorizes the Executive to "make the ordinary use of the soldiers . . . ; that he may kill persons who resist and, of course, that he may use the milder measure of seizing [and detaining] the bodies of those whom he considers to stand in the way of restoring peace." *Moyer* v. *Peabody,* 212 U. S. 78, 84 (1909).

The plurality, however, qualifies its recognition of the President's authority to detain enemy combatants in the war on terrorism in ways that are at odds with our precedent. Thus, the plurality relies primarily on Article 118 of the Geneva Convention (III) Relative to the Treatment of Prisoners

of War, Aug. 12, 1949, [1955] 6 U. S. T. 3406, T. I. A. S. No. 3364, for the proposition that "[i]t is a clearly established principle of the law of war that detention may last no longer than active hostilities." *Ante*, at 520. It then appears to limit the President's authority to detain by requiring that "the record establis[h] that United States troops are still involved in active combat in Afghanistan" because, in that case, detention would be "part of the exercise of 'necessary and appropriate force.'" *Ante*, at 521. But I do not believe that we may diminish the Federal Government's war powers by reference to a treaty and certainly not to a treaty that does not apply. See n. 6, *infra*. Further, we are bound by the political branches' determination that the United States is at war. See, *e. g.*, *Ludecke* v. *Watkins*, 335 U. S. 160, 167–170 (1948); *Prize Cases*, 2 Black, at 670; *Mott*, 12 Wheat., at 30. And, in any case, the power to detain does not end with the cessation of formal hostilities. See, *e. g.*, *Madsen* v. *Kinsella*, 343 U. S. 341, 360 (1952); *Johnson* v. *Eisentrager*, 339 U. S. 763, 786 (1950); cf. *Moyer*, *supra*, at 85.

Accordingly, the President's action here is "supported by the strongest of presumptions and the widest latitude of judicial interpretation." *Dames & Moore*, 453 U. S., at 668 (internal quotation marks omitted).[2] The question becomes whether the Federal Government (rather than the President acting alone) has power to detain Hamdi as an enemy combatant. More precisely, we must determine whether the Government may detain Hamdi given the procedures that were used.

---

[2] It could be argued that the habeas statutes are evidence of congressional intent that enemy combatants are entitled to challenge the factual basis for the Government's determination. See, *e. g.*, 28 U. S. C. §§ 2243, 2246. But factual development is needed only to the extent necessary to resolve the legal challenge to the detention. See, *e. g.*, *Walker* v. *Johnston*, 312 U. S. 275, 284 (1941).

## III

I agree with the plurality that the Federal Government has power to detain those that the Executive Branch determines to be enemy combatants. See *ante*, at 518. But I do not think that the plurality has adequately explained the breadth of the President's authority to detain enemy combatants, an authority that includes making virtually conclusive factual findings. In my view, the structural considerations discussed above, as recognized in our precedent, demonstrate that we lack the capacity and responsibility to second-guess this determination.

This makes complete sense once the process that is due Hamdi is made clear. As an initial matter, it is possible that the Due Process Clause requires only "that our Government must proceed according to the 'law of the land'—that is, according to written constitutional and statutory provisions." *In re Winship*, 397 U. S. 358, 382 (1970) (Black, J., dissenting). I need not go this far today because the Court has already explained the nature of due process in this context.

In a case strikingly similar to this one, the Court addressed a Governor's authority to detain for an extended period a person the executive believed to be responsible, in part, for a local insurrection. Justice Holmes wrote for a unanimous Court:

> "When it comes to a decision by the head of the State upon a matter involving its life, the ordinary rights of individuals must yield to what *he deems* the necessities of the moment. Public danger warrants the substitution of executive process for judicial process. This was admitted with regard to killing men in the actual clash of arms, and we think it obvious, although it was disputed, that the same is true of temporary detention to prevent apprehended harm." *Moyer*, 212 U. S., at 85 (citation omitted; emphasis added).

The Court answered Moyer's claim that he had been denied due process by emphasizing:

"[I]t is familiar that what is due process of law depends on circumstances. It varies with the subject-matter and the necessities of the situation. Thus summary proceedings suffice for taxes, and executive decisions for exclusion from the country. . . . Such arrests are not necessarily for punishment, but are by way of precaution to prevent the exercise of hostile power." *Id.*, at 84–85 (citations omitted).

In this context, due process requires nothing more than a good-faith executive determination.[3] To be clear: The Court has held that an Executive, acting pursuant to statutory and constitutional authority, may, consistent with the Due Process Clause, unilaterally decide to detain an individual if the Executive deems this necessary for the public safety *even if he is mistaken.*

*Moyer* is not an exceptional case. In *Luther* v. *Borden*, 7 How. 1 (1849), the Court discussed the President's constitutional and statutory authority, in response to a request from a state legislature or executive, "'to call forth such number of the militia of any other State or States, as may be applied for, as he may judge sufficient to suppress [an] insurrection.'" *Id.*, at 43 (quoting Act of Feb. 28, 1795). The Court explained that courts could not review the President's decision to recognize one of the competing legislatures or executives. See 7 How., at 43. If a court could second-guess this determination, "it would become the duty of the court (provided it came to the conclusion that the President had decided incorrectly) to discharge those who were arrested or detained

---

[3] Indeed, it is not even clear that the Court required good faith. See *Moyer,* 212 U. S., at 85 ("It is not alleged that [the Governor's] judgment was not honest, if that be material, or that [Moyer] was detained after fears of the insurrection were at an end").

by the troops in the service of the United States." *Ibid.* "If the judicial power extends so far," the Court concluded, "the guarantee contained in the Constitution of the United States [referring to Art. IV, §4] is a guarantee of anarchy, and not of order." *Ibid.* The Court clearly contemplated that the President had authority to detain as he deemed necessary, and such detentions evidently comported with the Due Process Clause as long as the President correctly decided to call forth the militia, a question the Court said it could not review.

The Court also addressed the natural concern that placing "this power in the President is dangerous to liberty, and may be abused." *Id.*, at 44. The Court noted that "[a]ll power may be abused if placed in unworthy hands," and explained that "it would be difficult . . . to point out any other hands in which this power would be more safe, and at the same time equally effectual." *Ibid.* Putting that aside, the Court emphasized that this power "is conferred upon him by the Constitution and laws of the United States, and must therefore be respected and enforced in its judicial tribunals." *Ibid.* Finally, the Court explained that if the President abused this power "it would be in the power of Congress to apply the proper remedy. But the courts must administer the law as they find it." *Id.*, at 45.

Almost 140 years later, in *United States* v. *Salerno*, 481 U. S. 739, 748 (1987), the Court explained that the Due Process Clause "lays down [no] categorical imperative." The Court continued:

> "We have repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest. For example, in times of war or insurrection, when society's interest is at its peak, the Government may detain individuals whom the Government believes to be dangerous." *Ibid.*

The Court cited *Ludecke* v. *Watkins*, 335 U. S. 160 (1948), for this latter proposition even though *Ludecke* actually involved detention of enemy aliens. See also *Selective Draft Law Cases*, 245 U. S. 366 (1918); *Jacobson* v. *Massachusetts*, 197 U. S. 11, 27–29 (1905) (upholding legislated mass vaccinations and approving of forced quarantines of Americans even if they show no signs of illness); cf. *Kansas* v. *Hendricks*, 521 U. S. 346 (1997); *Juragua Iron Co.* v. *United States*, 212 U. S. 297 (1909).

The Government's asserted authority to detain an individual that the President has determined to be an enemy combatant, at least while hostilities continue, comports with the Due Process Clause. As these cases also show, the Executive's decision that a detention is necessary to protect the public need not and should not be subjected to judicial second-guessing. Indeed, at least in the context of enemy-combatant determinations, this would defeat the unity, secrecy, and dispatch that the Founders believed to be so important to the warmaking function. See Part I, *supra*.

I therefore cannot agree with JUSTICE SCALIA's conclusion that the Government must choose between using standard criminal processes and suspending the writ. See *ante*, at 578 (dissenting opinion). JUSTICE SCALIA relies heavily upon *Ex parte Milligan*, 4 Wall. 2 (1866), see *ante*, at 567–568, 570–572, and three cases decided by New York state courts in the wake of the War of 1812, see *ante*, at 565–566. I admit that *Milligan* supports his position. But because the Executive Branch there, unlike here, did not follow a specific statutory mechanism provided by Congress, the Court did not need to reach the broader question of Congress' power, and its discussion on this point was arguably dicta, see 4 Wall., at 122, as four Justices believed, see *id.*, at 132, 134–136 (Chase, C. J., joined by Wayne, Swayne, and Miller, JJ., concurring in judgment).

More importantly, the Court referred frequently and pervasively to the criminal nature of the proceedings instituted

against Milligan. In fact, this feature serves to distinguish the state cases as well. See *In re Stacy,* 10 Johns. *328, *334 (N. Y. 1813) ("A military commander is here assuming *criminal jurisdiction* over a private citizen" (emphasis added)); *Smith* v. *Shaw,* 12 Johns. *257, *265 (N. Y. 1815) (Shaw "might be amenable to the civil authority for treason; but could not *be punished,* under martial law, as a spy" (emphasis added)); *M'Connell* v. *Hampton,* 12 Johns. *234 (N. Y. 1815) (same for treason).

Although I do acknowledge that the reasoning of these cases might apply beyond criminal punishment, the punishment-nonpunishment distinction harmonizes all of the precedent. And, subsequent cases have at least implicitly distinguished *Milligan* in just this way. See, *e. g., Moyer,* 212 U. S., at 84–85 ("Such arrests are not necessarily for punishment, but are by way of precaution"). Finally, *Quirin* overruled *Milligan* to the extent that those cases are inconsistent. See *Quirin,* 317 U. S., at 45 (limiting *Milligan* to its facts). Because the Government does not detain Hamdi in order to punish him, as the plurality acknowledges, see *ante,* at 518–519, *Milligan* and the New York cases do not control.

JUSTICE SCALIA also finds support in a letter Thomas Jefferson wrote to James Madison. See *ante,* at 564. I agree that this provides some evidence for his position. But I think this plainly insufficient to rebut the authorities upon which I have relied. In any event, I do not believe that JUSTICE SCALIA's evidence leads to the necessary "clear conviction that [the detention is] in conflict with the Constitution or laws of Congress constitutionally enacted," *Quirin, supra,* at 25, to justify nullifying the President's wartime action.

Finally, JUSTICE SCALIA's position raises an additional concern. JUSTICE SCALIA apparently does not disagree that the Federal Government has all power necessary to protect the Nation. If criminal processes do not suffice, however, JUSTICE SCALIA would require Congress to suspend the writ. See *ante,* at 577–578. But the fact that the writ may

not be suspended "unless when in Cases of Rebellion or Invasion the public Safety may require it," Art. I, § 9, cl. 2, poses two related problems. First, this condition might not obtain here or during many other emergencies during which this detention authority might be necessary. Congress would then have to choose between acting unconstitutionally[4] and depriving the President of the tools he needs to protect the Nation. Second, I do not see how suspension would make constitutional otherwise unconstitutional detentions ordered by the President. It simply removes a remedy. JUSTICE SCALIA's position might therefore require one or both of the political branches to act unconstitutionally in order to protect the Nation. But the power to protect the Nation must be the power to do so lawfully.

Accordingly, I conclude that the Government's detention of Hamdi as an enemy combatant does not violate the Constitution. By detaining Hamdi, the President, in the prosecution of a war and authorized by Congress, has acted well within his authority. Hamdi thereby received all the process to which he was due under the circumstances. I therefore believe that this is no occasion to balance the competing interests, as the plurality unconvincingly attempts to do.

IV

Although I do not agree with the plurality that the balancing approach of *Mathews* v. *Eldridge*, 424 U. S. 319 (1976), is the appropriate analytical tool with which to analyze this case,[5] I cannot help but explain that the plurality misapplies its chosen framework, one that if applied correctly would probably lead to the result I have reached. The plurality devotes two paragraphs to its discussion of the Government's interest, though much of those two paragraphs explain why the Government's concerns are misplaced. See *ante*, at 531–

---

[4] I agree with JUSTICE SCALIA that this Court could not review Congress' decision to suspend the writ. See *ante*, at 577–578.

[5] Evidently, neither do the parties, who do not cite *Mathews* even once.

532. But: "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Agee*, 453 U. S., at 307 (quoting *Aptheker*, 378 U. S., at 509). In *Moyer*, the Court recognized the paramount importance of the Governor's interest in the tranquility of a Colorado town. At issue here is the far more significant interest of the security of the Nation. The Government seeks to further that interest by detaining an enemy soldier not only to prevent him from rejoining the ongoing fight. Rather, as the Government explains, detention can serve to gather critical intelligence regarding the intentions and capabilities of our adversaries, a function that the Government avers has become all the more important in the war on terrorism. See Brief for Respondents 15; App. 347–351.

Additional process, the Government explains, will destroy the intelligence gathering function. Brief for Respondents 43–45. It also does seem quite likely that, under the process envisioned by the plurality, various military officials will have to take time to litigate this matter. And though the plurality does not say so, a meaningful ability to challenge the Government's factual allegations will probably require the Government to divulge highly classified information to the purported enemy combatant, who might then upon release return to the fight armed with our most closely held secrets.

The plurality manages to avoid these problems by discounting or entirely ignoring them. After spending a few sentences putatively describing the Government's interests, the plurality simply assures the Government that the alleged burdens "are properly taken into account in our due process analysis." *Ante*, at 532. The plurality also announces that "the risk of an erroneous deprivation of a detainee's liberty interest is unacceptably high under the Government's proposed rule." *Ante*, at 532–533 (internal quotation marks omitted). But there is no particular reason to believe that the federal courts have the relevant information and exper-

tise to make this judgment. And for the reasons discussed in Part I, *supra,* there is every reason to think that courts cannot and should not make these decisions.

The plurality next opines that "[w]e think it unlikely that this basic process will have the dire impact on the central functions of warmaking that the Government forecasts." *Ante,* at 534. Apparently by limiting hearings "to the alleged combatant's acts," such hearings "meddl[e] little, if at all, in the strategy or conduct of war." *Ante,* at 535. Of course, the meaning of the combatant's acts may become clear only after quite invasive and extensive inquiry. And again, the federal courts are simply not situated to make these judgments.

Ultimately, the plurality's dismissive treatment of the Government's asserted interests arises from its apparent belief that enemy-combatant determinations are not part of "the actual prosecution of a war," *ibid.,* or one of the "central functions of warmaking," *ante,* at 534. This seems wrong: Taking *and holding* enemy combatants is a quintessential aspect of the prosecution of war. See, *e. g., ante,* at 518–519; *Quirin,* 317 U. S., at 28. Moreover, this highlights serious difficulties in applying the plurality's balancing approach here. First, in the war context, we know neither the strength of the Government's interests nor the costs of imposing additional process.

Second, it is at least difficult to explain why the result should be different for other military operations that the plurality would ostensibly recognize as "central functions of warmaking." As the plurality recounts:

> "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner." *Ante,* at 533 (internal quotation marks omitted).

See also *ibid.* ("notice" of the Government's factual asser-
tions and "a fair opportunity to rebut [those] assertions be-
fore a neutral decisionmaker" are essential elements of due
process). Because a decision to bomb a particular target
might extinguish *life* interests, the plurality's analysis seems
to require notice to potential targets. To take one more ex-
ample, in November 2002, a Central Intelligence Agency
(CIA) Predator drone fired a Hellfire missile at a vehicle in
Yemen carrying an al Qaeda leader, a citizen of the United
States, and four others. See Priest, CIA Killed U. S. Citizen
In Yemen Missile Strike, Washington Post, Nov. 8, 2002,
p. A1. It is not clear whether the CIA knew that an Ameri-
can was in the vehicle. But the plurality's due process
would seem to require notice and opportunity to respond
here as well. Cf. *Tennessee* v. *Garner,* 471 U. S. 1 (1985). I
offer these examples not because I think the plurality would
demand additional process in these situations but because it
clearly would not. The result here should be the same.

I realize that many military operations are, in some sense,
necessary. But many, if not most, are merely expedient, and
I see no principled distinction between the military opera-
tion the plurality condemns today (the holding of an enemy
combatant based on the process given Hamdi) from a variety
of other military operations. In truth, I doubt that there is
any sensible, bright-line distinction. It could be argued that
bombings and missile strikes are an inherent part of war,
and as long as our forces do not violate the laws of war, it is
of no constitutional moment that civilians might be killed.
But this does not serve to distinguish this case because it is
also consistent with the laws of war to detain enemy combat-
ants exactly as the Government has detained Hamdi.[6] This,
in fact, bolsters my argument in Part III to the extent that

---

[6] Hamdi's detention comports with the laws of war, including the Geneva
Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12,
1949, [1955] 6 U. S. T. 3406, T. I. A. S. No. 3364. See Brief for Respond-
ents 22–24.

the laws of war show that the power to detain is part of a sovereign's war powers.

Undeniably, Hamdi has been deprived of a serious interest, one actually protected by the Due Process Clause. Against this, however, is the Government's overriding interest in protecting the Nation. If a deprivation of liberty can be justified by the need to protect a town, the protection of the Nation, *a fortiori*, justifies it.

I acknowledge that under the plurality's approach, it might, at times, be appropriate to give detainees access to counsel and notice of the factual basis for the Government's determination. See *ante*, at 532–533. But properly accounting for the Government's interests also requires concluding that access to counsel and to the factual basis would not always be warranted. Though common sense suffices, the Government thoroughly explains that counsel would often destroy the intelligence gathering function. See Brief for Respondents 42–43. See also App. 347–351 (affidavit of Col. D. Woolfolk). Equally obvious is the Government's interest in not fighting the war in its own courts, see, *e. g., Johnson* v. *Eisentrager*, 339 U. S., at 779, and protecting classified information, see, *e. g., Department of Navy* v. *Egan*, 484 U. S. 518, 527 (1988) (President's "authority to classify and control access to information bearing on national security and to determine" who gets access "flows primarily from [the Commander in Chief Clause] and exists quite apart from any explicit congressional grant"); *Agee*, 453 U. S., at 307 (upholding revocation of former CIA employee's passport in large part by reference to the Government's need "to protect the secrecy of [its] foreign intelligence operations").[7]

---

[7] These observations cast still more doubt on the appropriateness and usefulness of *Mathews* v. *Eldridge*, 424 U. S. 319 (1976), in this context. It is, for example, difficult to see how the plurality can insist that Hamdi unquestionably has the right to access to counsel in connection with the proceedings on remand, when new information could become available to the Government showing that such access would pose a grave risk to na-

\*　　\*　　\*

For these reasons, I would affirm the judgment of the Court of Appeals.

_____

tional security. In that event, would the Government need to hold a hearing before depriving Hamdi of his newly acquired right to counsel even if that hearing would itself pose a grave threat?